# 14-1813(L)

### 14-2892 (con); 14-3339(con)

## In the
## United States Court of Appeals
## For the Second Circuit



OKSANA S. BAIUL,

*Plaintiff-Appellant,*

v.

NBCUNIVERSAL MEDIA, LLC and NBC SPORTS NETWORK, L.P.,

*Defendants-Appellees,*

DISSON SKATING, LLC,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

RAYMOND J. MARKOVICH, ESQ.
*Attorney for Plaintiff-Appellant*
351 Westbourne Drive
West Hollywood, California 90048
(323) 401-8032



**Printed on Recycled Paper**

APPELLATE INNOVATIONS
(914) 948-2240

8782

# TABLE OF CONTENTS

| SECTION | PAGES |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| JURISDICTIONAL STATEMENT | 1 |
| STATEMENT OF THE ISSUES PRESENTED FOR REVIEW | 1 |
| 1.  Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a) - Use In Commerce | 1 |
| 2.  Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising | 2 |
| 3.  Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51 | 2 |
| 4.  Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117 | 3 |
| 5.  Case 14-3339 - Award of Attorney's Fees | 3 |
| STATEMENT OF THE CASE | 3 |
| 1.  The Nature Of The Case | 3 |
| 2.  The Course of Proceedings and Disposition Below | 4 |
| STATEMENT OF FACTS | 5 |
| SUMMARY OF ARGUMENT | 17 |
| 1.  Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a) - Use In Commerce | 17 |
| 2.  Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising | 18 |

i

| SECTION | PAGES |
|---|---|
| 3. Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51 | 19 |
| 4. Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117 | 20 |
| 5. Case 14-3339 - Award of Attorney's Fees | 21 |
| STANDARD OF REVIEW - ARGUMENT SECTIONS 1-3 | 22 |
| ARGUMENT | 22 |
| 1. Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a) - Use In Commerce | 22 |
| 2. Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising | 32 |
| 3. Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51 | 37 |
| STANDARD OF REVIEW - ARGUMENT SECTION 4 | 40 |
| ARGUMENT | 40 |
| 4. Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117 | 40 |
| STANDARD OF REVIEW - ARGUMENT SECTION 5 | 48 |
| ARGUMENT | 48 |
| 5. Case 14-3339 - Award of Attorney's Fees | 48 |
| CONCLUSION | 58 |
| CERTIFICATE OF COMPLIANCE | 61 |

# TABLE OF AUTHORITIES

**AUTHORITY**                                                     **PAGES**

| Authority | Pages |
|---|---|
| 15 U.S.C. § 1117 | 3, 20, 40, 47, 59 |
| 15 U.S.C. § 1117(a) | 3, 21, 40, 48, 59 |
| 15 U.S.C. § 1125(a) | 1-2, 4, 17, 19, 22, 37 |
| 15 U.S.C. § 1127 | 23, 30 |
| 28 U.S.C. § 1291 | 1 |
| 28 U.S.C. § 1332 | 1 |
| 28 U.S.C. § 1441 | 1 |
| 28 U.S.C. § 1446 | 1 |
| 28 U.S.C. § 1927 | 44 |
| FRCP 11 | 44 |
| FRCP 26 | 42 |
| FRCP 68 | 44, 51 |
| New York Civil Rights Law § 51 | 2, 4, 18-19, 32-33, 35, 37, 41 |
| Section 652E of the Restatement (2d) of Torts | 33 |
| *1-800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 408-410 (2d Cir. 2005) | 24, 25 |
| *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395 (1993) | 39, 43 |
| *Carrero v. N.Y.C. Hous. Auth.,* 685 F.Supp. 904, 908–09 (S.D.N.Y.1988), *aff'd in relevant part* 890 F.2d 569, 582 (2d Cir.1989) | 50 |

| AUTHORITY | PAGES |
|---|---|

*F.H. Krear & Co. v. Nineteen Named Trustees*,
810 F.2d 1250, 1263 (2d Cir. 1987) — 56

*Guess? v. Gold Center Jewelry,*
997 F.Supp. 409, 412 (S.D.N.Y 1998) — 46

*Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir. 1996) — 22

*IMAF, S.p.A. v. J.C. Penney Co., Inc.,* 810 F.Supp. 96, 100
(S.D.N.Y. 1992) — 45, 47

*Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990) — 37, 40

*Juicy Couture, Inc. v. L'Oreal USA, Inc.,* 2006 WL 2591478
at *7 (S.D.N.Y. 2006) — 41, 42, 44, 47

*Kelly-Brown v. Winfrey*, 717 F.3d 295, 305-306 (2d Cir. 2013) — 23, 26, 30

*Lerman v. Flynt*, 745 F.2d 123, 130 (2d Cir. 1984) — 33, 34, 35

*Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986) — 50

*Louis Vuitton Malletier S.A. v. LY USA, Inc.,*
676 F.3d 83, 111 (2d Cir. 2012) — 46

*Momentum Luggage & Leisure Bags v. Jansport, Inc.,*
2001 WL 1388063 at *7 (S.D.N.Y. 2001) — 44

*New York State Association For Retarded Children, Inc., v. Carey,*
711 F.2d 1136, 1154 (2d Cir. 1983) — 48-59

*Nu–Life Constr. Corp. v. Bd. of Educ. of the City of New York,*
795 F.Supp. 602, 606 (E.D.N.Y.1992) — 50

*Nussenzweig v. Dicorcia,* 9 N.Y.3d 184 (2007) — 41

*Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986) — 58

| AUTHORITY | PAGES |
|---|---|
| *Planned Parenthood Federation of America, Inc. v. Bucci,* 1997 WL 133313, at *4 (S.D.N.Y March 24, 1997) | 23, 28 |
| *Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 520 (S.D.N.Y 1994) (citing *Orshan v. Macchiarola,* 629 F.Supp. 1014, 1019 (E.D.N.Y. 1986)) | 52-54, 57-58 |
| *Record Club of America, Inc. v. United Artisits Records, Inc.,* 196 F.Supp. 940, 944 (S.D.N.Y 1988) | 39, 43 |
| *Scott v. City of New York,* 626 F.3d 130, 133-134 (2d Cir. 2010) | 48-52, 54-59 |
| *Sub-Zero, Inc.,* 2014 WL 1303434 at 10 (S.D.N.Y. 2014) | 56 |
| *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1343 (2d Cir.1994) | 50 |
| *Twin Peaks Productions, Inc. v. Publications International, Ltd.,* 996 F2d 1366, 1383 (2d Cir. 1993) | *40, 48* |
| *United States v. Potempkin Cadillac Corp.,* 689 F.2d 379 (2d Cir. 1982) | 45-47 |
| *United We Stand America, Inc. v. United We Stand, America New York, Inc.,* 128 F.3d 86, 92-93 (2d Cir. 1997) | 23, 28 |
| *Viola Sportswear, Inc. v. Mimum,* 574 F.Supp. 619, 621 (E.D.N.Y. 1983) | 45, 47 |
| *Yantha v. Omni Childhood Center, Inc.,* 2013 WL 5327516, *9 (E.D.N.Y. 2013) | 33 |
| *Zeno v. Pine Plains Cent. School Dist.,* 702 F.3d 655, 671 (2d Cir. 2012) | 37, 40 |

## PRELIMINARY STATEMENT

Plaintiff/Appellant Oksana S. Baiul ("Baiul") appeals from a final judgment and two orders by the United States District Court for the Southern District of New York (Forrest, J). (A-1464; A-1089; A-1499; A-1603). Baiul brings these appeals against Defendants/Appellees NBCUniversal Media, LLC and NBC Sports Network, LP (collectively and individually "Appellee" or "NBC").[1]

## JURISDICTIONAL STATEMENT

The Court below had original jurisdiction pursuant 28 U.S.C. §§ 1332, 1441 and 1446. This Court has jurisdiction of these appeals pursuant to 28 U.S.C. § 1291. Final judgment was filed in the Court below on April 30, 2014 and entered in the court below on May 7, 2014. (A-1464). The appeals are from a final judgment that granted summary judgment for all Defendants and dismissed all of Baiul's claims, an order dated July 14, 2014 granting NBC's motion for attorney's fees and an order dated August 22, 2014 awarding $98,540.08 in attorney's fees to NBC. (A-1464; A-1089; A-1499; A-1603).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.   **Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a)**

      **- Use In Commerce**

---

[1] Baiul's appeal in Case 14-1813 is against only NBCUniversal Media, LLC but Baiul's appeals in Case 14-2892 and Case 14-3339 are against both NBCUniversal Media, LLC and NBC Sports Network, LP. For ease of reference, NBC is used throughout both individually and collectively.

Whether there are disputed issue(s) of material fact and/or any evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC are uses in commerce and/or whether, as a matter of law, one or more of the Unauthorized Uses by NBC are uses in commerce?

2.      **Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising**

Whether there are disputed issue(s) of material fact and/or any evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC were for trade or advertising purposes and/or whether, as a matter of law, one or more of the Unauthorized Uses by NBC were for trade or advertising purposes?

3.      **Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51**

Whether there are disputed issue(s) of material fact and/or any evidence in the record from which a reasonable inference could be drawn in favor of Baiul that Baiul has been damaged by one or more of the Unauthorized Uses by NBC and/or whether, as a matter of law, Baiul has been damaged by one or more of the Unauthorized Uses by NBC?

**4.     Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117**

Whether Baiul's claims have merit, were not brought for an improper purpose and were not pursued in a manner that rendered this action "exceptional" within the meaning of 15 U.S.C. § 1117?

**5.     Case 14-3339 - Award of Attorney's Fees**

Whether the Court, in its stated "exercise of its considerable discretion", erred as a matter of law since the Court only had "some limited discretion to make exceptions to the hard-and-fast rule" in awarding attorney's fees of $98,540.08 in total to the prevailing party under 15 U.S.C. § 1117(a) for Lanham Act claims, non-Lanham Act claims, a non-Lanham Act related case and/or an unrelated case where the prevailing party had failed to provide the required, complete, contemporaneous records indicating, for each attorney, the date, the hours expended, and the nature of the work done?

## STATEMENT OF THE CASE

**1.     The Nature Of The Case**

This Action is about exploitation of Baiul without Baiul's consent. From July 13, 2011 (but possibly as early as April 2011) through May 15, 2012, Appellee NBCUniversal Media, LLC, NBC Sports Network, LP and Disson Skating, LLC ("Disson") (collectively "Defendants") no less than

3

twenty-six (26) times in total and no less than ten (10) times as alleged in the complaint, knowingly, intentionally, and maliciously used, published and disseminated Plaintiff's likeness, persona, picture, image and/or name as a headliner, within the State of New York, for purposes of advertising and/or trade, to promote the sale of defendants' products, without Plaintiff's written consent. ("Total Uses"). Specifically at issue in this appeal are the unauthorized use of Baiul's name 3 times as a headliner by NBC in the February 2, 2012, NBC copyrighted Press Release, that was posted and advertised on NBC's website ("Press Release" or "NBC Pandora Press Release") and the unauthorized use of Baiul's name 2 times as a headliner directly caused by NBC on The Entertainment Hotline website dated February 2, 2012 ("The Entertainment Hotline"). (A-129; A-130). The Press Release and The Entertainment Hotline are collectively referred to as "Unauthorized Uses" and individually referred to as the "Press Release", "The Entertainment Hotline" and/or "Unauthorized Use".

**2.    The Course of Proceedings and Disposition Below**

Baiul filed suit on February 1, 2013 against NBC in New York State Supreme Court, New York County, for violations of the Lanham Act 15 U.S.C. § 1125(a) and New York Civil Rights Law § 51, as well as, common law fraud and negligent misrepresentation. The Action was

removed by Disson Skating, LLC to the Federal District Court for the Southern District of New York ("Court") on April 3, 2013. On October 24, 2013, the defendants moved for Summary Judgment and the Court granted summary judgment for all Defendants. (A-1464; A-1089). The Court then by order on July 14, 2014 granted NBC's motion for attorney's fees and then by order on August 22, 2014 awarded NBC $98,540.08 in attorney's fees. (A-1499; A-1603). Baiul timely filed notices of appeal. (A-1127; A-1592; A-1604).

## STATEMENT OF FACTS

Plaintiff resided in Bucks County, the Commonwealth of Pennsylvania. NBC is a Delaware limited liability company registered to do business and doing business in the State of New York with offices at 30 Rockefeller Plaza, New York, NY 10112. (A-16.19). Defendant NBC Sports Network, LP is a Delaware limited partnership registered to do business and doing business in the State of New York with offices at 30 Rockefeller Plaza, New York, NY 10112. (A-16.19). NBCUniversal Media, LLC and NBC Sports Network, LP are related parties. (A-16.19). One of Disson's most recent live skating shows was produced by Disson in Jamestown, New York on December 15, 2012 and was broadcast nationwide and in New York State by NBC. (A-16.19-A-16.20).

Baiul, originally from Ukraine, is a world famous figure skater, actress, entertainer, designer and philanthropist who won the 1993 World Championship -

5

Ladies Figure Skating at the age of 15 years old and became the 1994 Olympic Gold Medalist, in Ladies Figure Skating, at the age of 16 years old, the second youngest in history to win after Sonja Henie who was 15 years old in 1928. Baiul has performed as a star in over 911 figure Skating Shows, 6 films, approximately 300 television programs and numerous commercials that aired thousands of times. Many of the films and/or television programs have been licensed and/or syndicated worldwide. Baiul also has 2 published books that have sold copies around the world and Baiul owns the Oksana Baiul Collection, the top selling independent figure skating apparel and accessories lines globally. (A-16.20, ¶5).

NBC is a company involved in feature film production, television, broadcasting, theme parks, music and other businesses. NBC owns and/or controls several major channels on United States television including NBC, NBC Sports and/or NBC Sports Network, which are viewable nationwide, including in New York State. (A-16.20, ¶6).

Disson regularly produces live figure Skating Shows, sometimes in New York State, many of which are produced for NBC and broadcast nationwide and in New York State. (A-16.20, ¶7). On or about July 12, 2011, Disson contacted a talent agent who was in communication and negotiation with Baiul concerning a potential agency agreement ("Potential Broker") and offered the Potential Broker two paid Skating Shows for Baiul. (A-16.20, ¶8). The first Skating Show would be

6

on December 15, 2011 in Greenville, South Carolina with the music group STYX ("STYX Show") and the second Skating Show would be on January 19, 2012 in the Seattle, Washington area with the singer Kenny G. ("KG Show"). (A-16.20-A-16.21, ¶8). Baiul would be a headliner or star for both shows. (A-16.21, ¶8).

Unbeknownst to Baiul until May 3, 2012, on or about July 13, 2011, Defendants produced and disseminated a 5 page marketing and advertising promotional packet for the KG Show. (A-16.21, ¶9; A-111-A-115).

On or about July 18, 2011, Disson contacted the Potential Broker with an offer for Baiul to appear in two upcoming NBC skating specials. The Skating Shows and NBC skating specials (collectively "Skating Shows") are one in the same. (A-16.21, ¶10). On or about July 25, 2011, Baiul requested from her Potential Broker when the agency contract(s) would be ready for review. (A-16.21, ¶11). Specifically, Baiul was referring to talent agency contract(s) as they were not yet agreed or executed, hence Baiul was not going to consider any offers until the terms of the talent agency contract(s) were agreed and executed. (A-16.21, ¶11). Baiul never signed a contract for either the STYX Show or the KG Show and Baiul never consented in writing to the Defendants using and/or exploiting Baiul's likeness, persona, picture, image, and/or name to advertize and/or promote and/or for any other purpose for either the STYX Show or the KG Show within the State of New York, or anywhere else. (A-16.22, ¶13; A-753:4-17).

7

Mr. Disson stated that he believed that NBC was a SAG signatory (A-704:18-21). Mr. Disson stated that Disson did not have an agreement with SAG (Screen Actors Guild) and he did not know about any agreement with AFTRA (The American Federation of Radio and Television Artists) for any of the eight shows in the 2011-2012 season (A-783:11-13; A-785:7-9). Despite being a producer in skating since 1989, Mr. Disson claimed that he did not know if most of the skaters were members of SAG or not and claimed that he never had to pay residuals on these shows (A-788:8-12; A-786:14-A787:3). Baiul is a member of SAG-AFTRA and was a member of both SAG and AFTRA in 2011 and 2012 (A-752:2-13).

Baiul had no contract or agreement with Disson, NBC, Steve Martin, Teresa Guy and/or anybody else for either the STYX Show or the KG Show, Baiul would not have signed a contract, orally agreed to participate or participated in either show because they were non-union shows (a violation of Global Rule One) and Defendants have not produced in evidence a signed contract with Baiul for either show, have provided no proof of payment to Baiul and Baiul was not paid for either the STYX Show or the KG Show. (A-752:2-A-753:17; A-755:10-A-756:23; A-887). Mr. Steve Martin testified that he was negotiating a most favored nations deal with Mr. Disson for Baiul and that in connection with Baiul, that would mean equal treatment in terms of pay,

8

transportation, hotels, etc. (A-946:12-25). Mr. Disson was the highest paid under Section 4.A. of his Employment Agreement. (A-794)).

Despite the fact that Baiul had no contract or agreement with Disson, NBC, Steve Martin, Teresa Guy and/or anybody else for either the STYX Show or the KG Show, sometime in the Fall of 2011, Magic 98.9 radio station advertised the STYX Show on their website with Baiul's name and/or likeness and promoted ticket sales for the STYX Show. (A-16.22, ¶16; A-121-A123). Baiul believes that the Defendants knowingly, intentionally, and maliciously were responsible for disseminating the false advertising to Magic 98.9. (A-121-A-123). Baiul only discovered this false advertising on or about June 21, 2012. (A-16.22, ¶16).

Unbeknownst to Baiul until on or about June 21, 2012, sometime in the Fall of 2011, ROCK 101 radio station falsely advertised the STYX Show on their website with Baiul's name and/or likeness and promoted ticket sales for the STYX Show. (A-16.22, ¶17; A-124-A-126).

Despite that fact that NBC had been notified by Disson about Baiul and Baiul had not consented in writing or otherwise, on February 2, 2012, NBC issued the Press Release in the State of New York with Baiul's name used three times as a headliner for the KG Show to be aired on February 4, 2012 on NBC but the live KG Show had been recorded on January 19, 2012. (A-460-A-461; A-110; A-77, ¶3; A-16.22-A16.23, ¶18; A-129).

9

Unbeknownst to Baiul until on or about May 8, 2012, also on February 2, 2012, The Entertainment Hotline posted the Defendants' press release on their website and thus Baiul's name (used twice as a headliner), within the State of New York, again was used for purposes of advertising and/or trade, to promote the sale of Defendants' products, without Baiul's written consent. (A-16.23, ¶19; A-130).

Baiul believes that this illegal activity was ongoing and unabated from the period of July 13, 2011 (but possibly as early as April 2011) through May 15, 2012, or beyond. (A-16.24, ¶22; A-111-A-115; A-121-A-123; A-124-A-126; A-129; A-130).

Mr. Disson testified that an NBC intern was responsible for the Press Release. (A-689:4-20). Ms. Gillian Lusins, on behalf of NBC, contradicted Mr. Disson and testified that no interns were involved in creating the Press Release but then Ms. Lusins claimed attorney client privilege when asked who creates press releases at NBC. (A-694-A-695:5). Ms. Lusins claimed attorney client privilege when asked who at NBC could answer questions about the Press Release. (A-691:17-A-692:2). Mr. Jonathan Miller testified that he believed that Ms. Justine DeMaio oversaw the Press Release but he did not state that she created it. (A-697:18-21). Ms. Lusins claimed that the incorrect Press Release was the fault of the event organizer (A-131). NBC also repeatedly refused to provide Baiul a web

10

stat report for NBC's website Media Village, the site that had hosted the Press Release. (A-621:12-A-623:10).

From July 13, 2011 (but possibly as early as April 2011) through May 15, 2012, Defendants, no less than twenty-six (26) times (that Baiul has discovered including the Press Release), knowingly, intentionally, and maliciously used, published and disseminated Baiul's likeness, persona, picture, image and/or name as a headliner, within the State of New York, for purposes of advertising and/or trade, to promote the sale of Defendants' products, without Baiul's written consent. (A-111-A-115; A-116-A-120; A-121-A-123; A-124-A-126; A-129; A-130; A-699-A-713; A-715-A-730; A-732-A-740; A-742-A-745; A-747-A-750).

The Total Uses include the following:

(1)   NBC Pandora Press Release - Baiul's name was used three (3) times as a headliner on only one (1) page and it was posted on NBC's website with worldwide dissemination to the general public to advertise Defendants' service which was the KG Show on NBC (A-129);

(2)   The Entertainment Hotline - Baiul's name was used two (2) times as a headliner and it was posted on a website with

11

worldwide dissemination to sell or influence viewers to watch the KG Show on NBC (A-130);

(3)     Magic 98.9 Advertising - Baiul's name was used one (1) time as a headliner and it was posted on a website with worldwide dissemination to sell viewers to watch NBC's Improv on Ice show either live at the Bi-Lo Center or on NBC (A-121-A-123);

(4)     Rock 101 Advertising - Baiul's name used one (1) time as a headliner and it was posted on a website with worldwide dissemination to sell viewers to watch NBC's Improv on Ice show live at the Bi-Lo Center and on NBC (A-124-A-126);

(5)     NBC's Improv on Ice Marketing and Advertising Promotional Packet or Materials or Deck - Baiul's name was used two (2) times and picture or image one (1) time all as a headliner (A-116-A-120);

(6)     NBC's Pandora Unforgettable Moments of Love on Ice Marketing and Advertising Promotional Packet or Materials or Deck  - Baiul's name was used two (2) times and picture or image one (1) time) all as a headliner (A-111-A-115);

(7)     NBC's Stride-Rite Marketing and Advertising Promotional Packet or Materials or Deck - Baiul's name was used two (2)

times and picture or image one (1) time all as a headliner and it was sent to Tamara Rabi at Optimedia, an Advertising Agency in New York, New York, in order to sell sponsorship advertising for the NBC Improve On Ice show (A-699-A-713);

(8)   NBC's Stouffer's Marketing and Advertising Promotional Packet or Materials or Deck Baiul's name used two (2) times and picture or image one (1) time all as a headliner and it was sent to Jackie Dyson at ZenithOptimedia, an advertising agency in New York, New York, in order to sell sponsorship advertising for the NBC Improve On Ice show (A-715-A-730);

(9)   NBC's Improv on Ice Marketing and Advertising Promotional Packet or Materials or Deck - Baiul's name was used two (2) times and picture or image one (1) time all as a headliner and it was sent to Tim Hill in order to sell sponsorship advertising for the Improve On Ice show and the e-mail from Mr. Rick Knopp indicates that they would have started using the Advertising Deck or Marketing Materials in early August 2011 (A-732-A-740);

(10)   NBC's Improv on Ice Fact Sheet - Baiul's name was used two (2) times all as a headliner and it was disseminated by Lynn

13

Plage on behalf of Defendants to sell the show (A-742-A-745); and

(11) NBC's Pandora Unforgettable Moments of Love on Ice Fact Sheet - Baiul's name was used two (2) times) all as a headliner and it was disseminated by Lynn Plage on behalf of Defendants to sell the show (A-747-A-750).

Baiul only learned of Defendants' illegal actions on or about May 3, 2012 and only as concerns the February 2, 2012 NBC Pandora Press Release for the KG Show and promptly contacted NBC's attorney on May 15, 2012. (A-465; A-16.24, ¶23). Despite being informed of NBC's illegal actions on May 15, 2012, NBC made no attempt to mitigate the damage done to Baiul. (A-16.24-A-16.25, ¶24). In fact, NBC issued no correcting press release at all of which Baiul is aware. *Id.*

Although the Court unreasonably found otherwise concerning there being a co-production, NBC claims, in its own copyrighted press release dated February 2, 2012, that Pandora - Unforgettable Moments Of Love On Ice "is part of the NBC Skating Series, produced by Disson Skating in conjunction with NBC" (A-1095, footnote 10; A-129). Furthermore, NBC was named 7 or more times and/or had an NBC logo on each and every Marketing and Advertising Promotional Packet or Materials or Deck that the Defendants used to advertise and/or promote the shows to advertising sponsors. (A-116-A-120; A-111-A-115; A-703-A-713; A-

720-A-A729; A-734-A-740). The NBC Skating Series was also advertised on both the NBC Improv on Ice Fact Sheet and the NBC Pandora Unforgettable Moments of Love on Ice Fact Sheet (A-742-A-745; A-747-A-750). The NBC Skating Series and the fact that the shows would also be broadcast on NBC was advertised on The Entertainment Hotline website, The Magic 98.9 website and the Rock 101 website (A-130; A-121-A-123; A-124-A-126). Mr. Stephen Disson produced for NBC the STYX Show and the KG Show. (A-784:12-17).

NBC owns local stations that sell their own advertising even on time-buy deals (like NBC alleges to have had with Disson for the STYX Show and the KG Show) and such local stations include WNBC in New York, WRC in Washington, D.C., WMAQ in Chicago and KNBC in Los Angeles (A-828:24-A-829:6). Mr. Miller, on behalf of NBC, testified that the local stations would be able to sell about two minutes of advertising time per hour of programming. (A-828:3-A-829:6). NBC also had a few minutes per two (2) hour show to promote NBC's other programs. (A-833:7-A-834:2). NBC has promotion time in different shows that it would use to promote other shows and they would not charge themselves for that time. (A-881:6-24). Ratings are a big factor in programming decisions (A-818:18-25) but exclusivities are also a factor (A-819:2-9) and the product that NBC sells "is the live exhibition, the contents: the game, the performance, the tournament, the match..." and the inventory or advertising that they sell around the

15

content is the currency (A-290:22-A-291:4). NBC was paid $400,000 for the KG Show but this $400,000 was not just for broadcasting time since NBC was contractually obligated to use "commercially reasonable efforts to make verbal or graphic mention of the umbrella sponsor in all promotions and announcements in connection with the Events." (A-822:21-A-823:14; A-1095; CA-60, Sec. 2, CA-61, Sec. 5).

Thus NBC had sold advertising spots each and every time that the umbrella sponsor's name was mentioned including, but not limited to, in the NBC Pandora Press Release that prominently mentions the umbrella sponsor's (Pandora's) name three times along with Baiul's name three times as a headliner. (CA-60, Sec. 2, CA-61, Sec. 5; A-129). Additionally, the Press Release itself is copyrighted. (A-129). While Mr. Miller, on behalf of NBC, named several costs, he could only specify up to $80,000 in costs for station compensation (A-873:25-A-874:4). NBC asserts that on a $400,000 buy like for the KG Show, the show would be profitable "[t]o a degree" for NBC. (A-878:20-22).

In the entertainment industry, when a figure skater, actress or entertainer does not show up for a scheduled, promoted and/or advertised show where they are a headliner or star, it can have a devastating effect on her career. (A-16.25, ¶25). It damages her ability to obtain: bookings for subsequent skating shows, paid performances, sponsorships, product endorsements, commercials, television shows,

feature films and/or other economic opportunities. *Id*. Very few executives in the entertainment industry would ever want to hire a figure skater, actress or entertainer who has a reputation as a "no show" including Mr. Stephen Disson, the president of Disson, at the time co-owned by NBC affiliate Comcast Spectacor, and the Defendants by their wrongful and illegal actions have caused Baiul to be labeled as a "no show". (*Id*.; A-811:2-21). Additionally, Defendants' actions presenting Baiul as a "no show" have caused and/or continue to cause Baiul great harm and financial loss. (A-955:6-A-956:10). Mr. Stephen Disson testified that he would not hire somebody that has a reputation as a "no show" (A-811:2-21). Baiul has been labeled a "no show" and the phone has stopped ringing. (A-955:6-A-956:10).

## SUMMARY OF THE ARGUMENT

**1. Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a) - Use In Commerce**

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC are uses in commerce and/or, as a matter of law, one or more of the Unauthorized Uses by NBC are uses in commerce.

17

The $400,000 fee paid to NBC which included the Pandora (contractually required) advertising in the Press Release, the other third party advertising on the NBC website where the Press Release was displayed, the third party advertising on The Entertainment Hotline website, the accessibility of both websites to world-wide consumers, the profitability of the Services for NBC, the approximately two minutes of advertising per show that were sold by each of the big local stations that NBC wholly owns in New York, Washington D.C., Chicago and Los Angeles, the few minutes per two (2) hour show to promote NBC's other programs (on which it was selling advertising) and/or the Skaters' agreements establish beyond a doubt that the Press Release and/or The Entertainment Hotline are Unauthorized Uses in commerce by NBC. (CA-60, Sec. 2, CA-61, Sec. 5; A-129; A-130; A-1095; A-828:24-A-829:6; A-878:20-22; A-828:3-A-829:6; A-833:7-A-834:2).

2.    **Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising**

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC were for trade or advertising purposes and/or, as a matter of law, one or more of the Unauthorized Uses by NBC were for trade or advertising purposes.

The $400,000 fee paid to NBC which included the Pandora (contractually required) advertising in the Press Release, the other third party advertising on the NBC website where the Press Release was displayed, the third party advertising on The Entertainment Hotline website, the accessibility of both websites to world-wide consumers, the profitability of the Services for NBC, the approximately two minutes of advertising per show that were sold by each of the big local stations that NBC wholly owns in New York, Washington D.C., Chicago and Los Angeles, the few minutes per two (2) hour show to promote NBC's other programs (on which it was selling advertising) and/or the Skaters' agreements establish beyond a doubt that the Press Release and/or The Entertainment Hotline are Unauthorized Uses in commerce by NBC. (CA-60, Sec. 2, CA-61, Sec. 5; A-129; A-130; A-1095; A-828:24-A-829:6; A-878:20-22; A-828:3-A-829:6; A-833:7-A-834:2).

3.  **Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51**

There are disputed issue(s) of material fact and/or any evidence in the record from which a reasonable inference could be drawn in favor of Baiul that Baiul has been damaged by one or more of the Unauthorized Uses by NBC and/or, as a matter of law, Baiul has been damaged by one or more of the Unauthorized Uses by NBC.

19

To date, NBC has exploited Baiul's trademark for free and this has caused damage to Baiul. (A-129; A-130; A-945:12-24; A-794; A-752:2-A-753:17; A-887). As concerns a reasonable license fee for damages, Mr. Steve Martin testified that he was negotiating a most favored nations deal with Mr. Disson for Baiul and that in connection with Baiul, that would mean equal treatment in terms of pay, transportation, hotels, etc. (A-945:12-24). Under a most favored nations deal, Baiul would have been paid the same as Mr. Stephen Disson for the Services but Baiul had no contract, was not paid anything and neither NBC nor the Defendants have provided proof of payment to Baiul. (A-945:12-24; A-794; A-752:2-A-753:17; A-887). Baiul has been labeled a "no show" and the phone has stopped ringing. (A-955:6-A-956:10). Baiul reasonably calculated her lost future profits over 10 years. (A-889-A-908).

**4.    Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117**

Baiul's claims have merit, were not brought for an improper purpose and were not pursued in a manner that rendered this action "exceptional" within the meaning of 15 U.S.C. § 1117.

Baiul proved the existence of the 26 Total Uses (including Baiul's name used 5 times by NBC as a headliner in the Unauthorized Uses). (A-111-A-115; A-116-A-120; A-121-A-123; A-124-A-126; A-129; A-130; A-699-A-

713; A-715-A-730; A-732-A-740; A-742-A-745; A-747-A-750). The record shows that the NBC Pandora Press Release for the broadcast was posted on NBC's website. (A-129). The record shows that the NBC Pandora Press Release for the broadcast was picked up and posted on the Entertainment Hotline website. (A-130). The record shows that the NBC Pandora Press Release was false. (A-1107). Issues upon which Baiul and the Court differ, in accordance with the decision and order, are whether the Unauthorized Uses were "in commerce" or not under the Lanham Act. (*See* Section 1 *Infra*). Furthermore, Baiul respectfully believes that the Court erred on the issue of damages as explained in Section 3 *Infra*.

## 5.    Case 14-3339 - Award of Attorney's Fees

The Court, in its stated "exercise of its considerable discretion", erred as a matter of law since the Court only had "some limited discretion to make exceptions to the hard-and-fast rule" in awarding attorney's fees of $98,540.08 in total to the prevailing party under 15 U.S.C. § 1117(a) for Lanham Act claims, non-Lanham Act claims, a non-Lanham Act related case and/or an unrelated case where NBC had failed to provide the required, complete, contemporaneous records indicating, for each attorney, the date, the hours expended, and the nature of the work done.

NBC has unreasonably failed to provide complete, contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done as is required by the authorities.

## STANDARD OF REVIEW

## ARGUMENT SECTIONS 1-3

The appellate standard of review is de novo with all ambiguities and permissible factual inferences to be resolved in favor of Appellant. *Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir. 1996).

## ARGUMENT

1. **Case 14-1813 - Claim - Violation of Lanham Act 15 U.S.C. § 1125(a) - Use In Commerce**

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC are uses in commerce and/or, as a matter of law, one or more of the Unauthorized Uses by NBC are uses in commerce.

The Lanham Act defines "use in commerce" as follows: "a mark shall be deemed to be in use in commerce— (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a

foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. "Use in commerce" denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profitmaking activity. *see Planned Parenthood Federation of America, Inc. v. Bucci,* 1997 WL 133313, at *4 (S.D.N.Y March 24, 1997); *United We Stand America, Inc. v. United We Stand, America New York, Inc.,* 128 F.3d 86, 92-93 (2d Cir. 1997).

The Court stated in its decision ""[f]or purposes of this chapter, a mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Id.; *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305-306 (2d Cir. 2013)("[I]n determining whether the plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction.")" (A-1114).

The Court states "[t]he record evidence establishes that the Press Release was issued on February 2, 2012 and posted on Media Village, a website used to provide United States-based media with information about upcoming NBC broadcasts." (A-1115). The NBC Pandora Press Release was posted by NBC on NBC's Media Village on Thursday, February 2, 2012, two days before the broadcast of the KG Show on Saturday, February 4, 2012. (A-1107). The services

23

were thus the NBC broadcast of the KG Show ("Services"). (A-1107). The Court went on to state that "Media Village is not targeted to the television viewing audience, advertisers or the general public; full access to the site requires registration with United States media credentials." (A-1115-A-1116). However, "targeted" and "full access" are both inconsistent with the ruling in *1-800 Contacts* where the court emphasized repeatedly the fact that the defendant never caused plaintiff's trademarks to be displayed to a consumer in finding no "use in commerce". *1-800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 408-410 (2d Cir. 2005). Despite the Court's statements of "targeted" and "full access", Baiul, a performer/skater, discovered the NBC Pandora Press Release and this logically proves that consumers world-wide likewise would have seen the NBC Pandora Press Release.[2] (A-16.23, ¶19; A-465; A-129). The NBC Pandora Press Release was on an http:// site and not a secure https:// site indicating open access to world-wide consumers. (A-129). Furthermore, despite NBC's assertions and the Court's ruling, this Court can go to http://www.nbcumv.com today and see for itself how "targeted" is the NBC Media Village site and how necessary is "full access". (A-129 - http://www.nbcumv.com).

The Court found that other media outlets rely on Media Village to create and report television listings. (A-1104). NBC and the Court acknowledged that one

---

[2] NBC repeatedly refused to provide Baiul a web stat report for Media Village, the site that had hosted the Press Release. (A-621:12-A-623:10).

source, other than Baiul, had picked up the press release and according to the record, this would have been The Entertainment Hotline. (A-1108-A-1109; A-131; A-129; A-130). The Entertainment Hotline is dated the same date, February 2, 2012, as the Press Release. (A-129; A-130).

Since the Court found that other media outlets rely on NBC's Media Village, it is illogical for the Court to have decided that when The Entertainment Hotline reprinted the text (although not the title) of NBC's Press Release word for word, that there exists no evidence connecting NBC with this Unauthorized Use. (A-1104, A-1113-A-1116; A-129; A-130). The Court already found that there was reliance by other media outlets on NBC's Media Village that means that NBC is connected with and in fact the direct cause of such Unauthorized Use by The Entertainment Hotline. (A-1104). The Entertainment Hotline clearly had accessed NBC's Media Village as reasonably expected by NBC and then The Entertainment Hotline disseminated to world-wide consumers the false information contained in the NBC Pandora Press Release. *See 1-800 Contacts at* 408-410; (A-1104; A-129; A-130). Furthermore, the Entertainment Hotline clearly advertised other products or services on its site including "Amazon", "Twitter", "RSS" and with banner advertising for "Charm & Chain" displayed very prominently next to The Entertainment Hotline's reprint of the Press Release for the Services advertised by NBC. (A-129; A-130). Additionally, Baiul's name is falsely used two times as a

headliner in The Entertainment Hotline that would surely indicate commercial advertising or speech as opposed to news. (A-130).

In *Kelly-Brown,* a website that had banner advertisements next to an unauthorized use was deemed to be a use in commerce. *Kelly-Brown* at 306. The Press Release itself was both published and copyrighted. (A-129).

NBC was paid $400,000 for the KG Show but this $400,000 was not just for broadcast time since NBC was contractually obligated to use "commercially reasonable efforts to make verbal or graphic mention of the umbrella sponsor (Pandora) in all promotions and announcements in connection with the Events." (A-822:21-A-823:14; A-1095; CA-60, Sec. 2, CA-61, Sec. 5). Thus NBC had sold advertising spots each and every time that the umbrella sponsor's name was mentioned including, but not limited to, in the NBC Pandora Press Release that prominently uses the umbrella sponsor's (Pandora's) name three times along with Baiul's name falsely used three times as a headliner. (CA-61, Sec. 2, 5; A-129). There are also multiple advertisements and/or links for third party companies "Facebook", "Twitter" and "RSS" contained in and adjacent to the Press Release. (A-129).

NBC wholly owns local stations that sell their own advertising on time-buy deals (like NBC alleges to have had with Disson for the KG Show) and such local stations include WNBC in New York, WRC in Washington, D.C., WMAQ in

Chicago and KNBC in Los Angeles (A-828:24-A-829:6). NBC admitted that its local stations would be able to sell about two minutes of advertising time per hour of programming. (A-828:3-A-829:6). NBC also had a few minutes per two (2) hour show to promote NBC's other programs. (A-833:7-A-834:2). NBC has promotion time in different shows that it would use to promote other shows and they would not charge themselves for that time. (A-881:6-24). Ratings are a big factor in programming decisions (A-818:18-25) but exclusivities are also a factor (A-819:2-9) and that the product that NBC sells "is the live exhibition, the contents: the game, the performance, the tournament, the match..." and the inventory or advertising that they sell around the content is the currency (A-290:22-A-291:4). Along with whatever NBC's wholly-owned local stations sold in advertising for the KG Show and the value of time used by NBC to promote its other programs during the KG Show, NBC was also paid $400,000 by Disson. (A-828:24-A-829:6; A-828:3-A-829:6; A-833:7-A-834:2; A-822:21-A-823:14; A-1095). While NBC named several costs, it could only specify up to $80,000 in costs for station compensation. (A-873:25-A-874:4). NBC asserts that on a $400,000 buy like for the KG Show, the show would be profitable "[t]o a degree" for NBC. (A-878:20-22). Based upon the foregoing, there was certainly profitmaking activity by NBC in connection with the Services. Although there is no requirement for profitmaking activity to establish Congress's authority under the

Commerce Clause and thus "use in commerce", the Court acknowledges that NBC made a $400,000 per broadcast fee from Disson including for the Services. *Planned Parenthood* at *4; *United* at 92-93; (A-1095).

While no contract or agreement was entered into with Baiul, Disson/NBC had written agreements with other skaters for the KG Show. (CA-41-CA56; *See also* A-763-A-779 for the STYX Show). Section 6(a) or 6(b) of such written agreements, states as follows:

"Skater grants to Disson and its licensees the non-exclusive right to use the Skater's approved names, likenesses, voice, performances and biography in connection with the broadcast, advertisement and promotion of the Event, the Program and excerpts of the Program in connection with any of Disson's rights hereunder, provided that no such use will constitute an endorsement of any product or service without Skater's consent."(CA-47-CA56 - see Section 6). So based upon the above Section 6(a) or 6(b) of the agreements, Disson and NBC could only use the Skater's approved names, likenesses, voice, performances and biography in connection with the broadcast, advertisement and promotion of the Event, the Program and excerpts of the Program but could not use Skater's approved names, likenesses, voice, performances and biography to endorse any product or service without Skater's consent. *Id.* The Event is defined as "the participation of Skater in the program for television entitled

"Pandora Unforgettable Moments of Love on Ice". (CA-47, ¶1; CA-52, ¶1). The Program is defined as any recordings of the Event and specifically the airing or broadcast on NBC. (CA-47, ¶1 & Sec. 1; CA-52, ¶1 & Sec. 1).

So these Skaters reasonably relied upon agreements that stated that Disson and its licensees (including NBC) only were granted the non-exclusive right to use "the Skater's approved names, likenesses, voice, performances and biography in connection with the broadcast, advertisement and promotion of the Event, the Program and excerpts of the Program ...." or in other words, these Skaters approved in writing only uses in commerce since their agreements clearly state only "broadcast, advertisement and promotion". (CA-49, Sec. 6; CA-54, Sec. 6).

So if Baiul had in fact had a contract for the Services (the KG Show), which she did not, both the NBC Pandora Press Release and The Entertainment Hotline would have been using her name in connection with the advertisement and promotion of the Event and Program (the Services) because that would have been the only right granted based upon the contracts that Disson had with other skaters for the KG Show and there is no reason to believe that those sections of Baiul's contract would have been any different had she had a contract. (CA-49, Sec. 6; CA-54, Sec. 6; *See also* A-763-A-779 for the STYX Show). Disson could not grant a right to NBC greater than it had itself.

NBC was responsible for the NBC Pandora Press Release and the Entertainment Hotline advertising that wrongly included Baiul's name as headliner and stated the "Pandora NBC Skating Series, produced by Disson Skating in conjunction with NBC." (A-129; A-130). Under *Kelly-Brown,* advertising and promotion of the Services are a "use in commerce" since Disson, and thus NBC, only had the right to use Skaters' approved names (trademarks) in the advertisement and promotion (to consumers) of the Event and Program (the Services) in connection with a commercial transaction and Disson and NBC were required to include Pandora's name as part of the fee paid to NBC. *Kelly-Brown* at 305-306; (CA-49, Sec. 6; CA-54, Sec. 6; CA-60, ¶2; CA-61, ¶5).

The Lanham Act further states that "the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."15 U.S.C. § 1127.

The Services were certainly not rendered for only one State since it was an NBC broadcast. (A-1101). Additionally, the Court would not have stated in the plural United States-based media and thus the Services were "rendered in more than one State." (A-1115-A-1116). The person rendering the services was NBC. (A-1115). NBC sells hundreds of hours of broadcast time annually to third-party

producers, so that they can air their sports programming on the NBC or the NBC Sports channel. (A-1093).

Disson has purchased broadcast time from NBC to broadcast its figure skating shows nationally (more than one State) on NBC since 1989. (A-1094). The Court incorrectly identified the eight Disson shows as "The 2011-2012 Disson Skating Series" when its trade name as advertised in the Press Release is actually the contractually required "Pandora NBC Skating Series", produced by Disson Skating in conjunction with NBC and part of the $400,000 fee that Disson paid NBC was to have Pandora's name in the Press Release. (A-1101; A-129; A-130; CA-60, ¶2; CA-61, ¶5; A-1095).

So along with advertising for Pandora's mark and advertising for "Facebook", "Amazon", "Twitter", "RSS" and/or "Charm & Chain", Baiul's mark was falsely used in commerce by NBC in the Press Release and/or The Entertainment Hotline because NBC was advertising Services and the Services were rendered in commerce and/or advertising Services rendered in more than one State and NBC rendering the Services was engaged in commerce in connection with the services. (CA-60, ¶2; CA-61, ¶5; A-129; A-130; A-1094; A-1101; A-1115-A-1116).

The $400,000 fee paid to NBC which included the Pandora (contractually required) advertising in the Press Release, the other third party advertising on the

NBC website where the NBC Pandora Press Release was displayed, the third party advertising on The Entertainment Hotline website, the accessibility of both websites to world-wide consumers, the profitability of the Services for NBC, the approximately two minutes of advertising per show that were sold by the big local wholly-owned stations that NBC owns in New York, Washington D.C., Chicago and Los Angeles, the few minutes per two (2) hour show to promote NBC's other programs (on which it was selling advertising) and/or the Skaters' agreements establish beyond a doubt that the Press Release and/or The Entertainment Hotline are Unauthorized Uses in commerce by NBC. (CA-60, Sec. 2, CA-61, Sec. 5; A-129; A-130; A-1095; A-828:24-A-829:6; A-878:20-22; A-828:3-A-829:6; A-833:7-A-834:2).

There are thus disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that the Unauthorized Uses by NBC in the NBC Pandora Press Release and/or The Entertainment Hotline are uses in commerce and/or, as a matter of law, the Unauthorized Uses by NBC in the Press Release and/or The Entertainment Hotline are uses in commerce.

## 2. Case 14-1813 - Claim - Violation of New York Civil Rights Law § 51 - Trade Or Advertising

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC were for trade or advertising purposes and/or, as a matter of law, one or more of the Unauthorized Uses by NBC were for trade or advertising purposes and thus the Court's decision is clearly in error.

To be a use for advertising purposes, "the use must appear in or as part of an advertisement or solicitation for patronage." *Lerman v. Flynt*, 745 F.2d 123, 130 (2d Cir. 1984); *Yantha v. Omni Childhood Center, Inc.,* 2013 WL 5327516, *9 (E.D.N.Y. 2013). To be liable for compensatory damages for use of a person's name, portrait or picture based on an advertising purpose claim, NBC need not have known that its use was without Baiul's consent. *Id*. The Press Release and/or The Entertainment Hotline were for soliciting the general public to watch the Services on NBC. (see Argument Section 1 *Supra*). Since Baiul did not in fact perform in the Services and provided no authorization to NBC or anybody else, Baiul clearly has an actionable claim for false advertising. (A-752:2-A-753:17; A-887).

As concerns the trade purposes claim under NYCRL § 51, we must first examine the false light tort. Section 652E of the Restatement (2d) of Torts that provides: One who gives publicity to a matter concerning another that places the

other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *Lerman* at 135. Baiul was falsely advertised no less than twenty-six (26) times by Defendants. (A-111-A-115; A-116-A-120; A-121-A-123; A-124-A-126; A-129; A-130; A-699-A-713; A-715-A-730; A-732-A-740; A-742-A-745; A-747-A-750). Baiul was falsely advertised 5 times as a headliner in total by NBC in the NBC Pandora Press Release and The Entertainment Hotline. (A-129; A-130). Such false advertising damages Baiul's ability to obtain: bookings for subsequent skating shows, paid performances, sponsorships, product endorsements, commercials, television shows, feature films and/or other economic opportunities. (A-16.25, ¶25). In the entertainment industry, when a figure skater, actress or entertainer does not show up for a scheduled, promoted and/or advertised show where they are a headliner or star, it can have a devastating effect on her career. (A-16.25, ¶25). It damages her ability to obtain: bookings for subsequent skating shows, paid performances, sponsorships, product endorsements, commercials, television shows, feature films and/or other economic opportunities. *Id*. Very few executives in the entertainment industry would ever want to hire a figure skater, actress or entertainer who has a reputation as a "no

show" including Mr. Stephen Disson, the president of Disson, an affiliate of NBC, and the Defendants by their wrongful and illegal actions have caused Baiul to be labeled as a "no show". (*Id*.; A-811:2-21). Additionally, Defendants' actions presenting Baiul as a "no show" have caused and/or continue to cause Baiul great harm and financial loss. (A-955:6-A-956:10). Mr. Disson testified that he would not hire somebody that has a reputation as a "no show" (A-811:2-21). Baiul has been labeled a "no show" and the phone has stopped ringing. (A-955:6-A-956:10).

Mr. Disson testified that an NBC intern was responsible for the NBC Pandora Press Release. (A-689:4-20). Ms. Gillian Lusins, on behalf of NBC, contradicted Mr. Disson and testified that no interns were involved in creating the Press Release but then Ms. Lusins claimed attorney client privilege when asked who creates press releases at NBC. (A-694-A-695:5). Ms. Lusins claimed attorney client privilege when asked who at NBC could answer questions about the Press Release. (A-691:17-A-692:2). Mr. Jonathan Miller testified that he believed that Ms. Justine DeMaio oversaw the Press Release but he did not state that she created it. (A-697:18-21). Ms. Lusins claimed that the incorrect Press Release was the fault of the event organizer (A-131). NBC also repeatedly refused to provide Baiul a web stat report for NBC's Media Village, the site that had hosted the NBC Pandora Press Release. (A-621:12-A-623:10).

35

Based upon the foregoing, NBC acted in reckless disregard as to the falsity of the Press Release and/or The Entertainment Hotline and the false light in which Baiul would be placed so Baiul also clearly has a claim under the trade purposes prong of NYCRL § 51. *Lerman* at 135.

The $400,000 fee paid to NBC which included the Pandora (contractually required) advertising in the Press Release, the other third party advertising on the NBC website where the NBC Pandora Press Release was displayed, the third party advertising on The Entertainment Hotline website, the accessibility of both websites to world-wide consumers, the profitability of the Services for NBC, the approximately two minutes of advertising per show that were sold by each of the big local stations that NBC wholly owns in New York, Washington D.C., Chicago and Los Angeles, the few minutes per two (2) hour show to promote NBC's other programs (on which it was selling advertising) and/or the Skaters' agreements establish beyond a doubt that the NBC Pandora Press Release and/or The Entertainment Hotline are Unauthorized Uses by NBC that were for trade or advertising purposes. (CA-60, Sec. 2, CA-61, Sec. 5; A-129; A-130; A-1095; A-828:24-A-829:6; A-878:20-22; A-828:3-A-829:6; A-833:7-A-834:2).

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that one or more of the Unauthorized Uses by NBC were for trade or advertising purposes

36

and/or, as a matter of law, one or more of the Unauthorized Uses by NBC were for trade or advertising purposes and thus the Court's decision is clearly in error.

3.    **Case 14-1813 - Damages for Violations of Lanham Act 15 U.S.C. § 1125(a) and/or New York Civil Rights Law § 51**

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that Baiul is or is likely to be damaged by one or more of the Unauthorized Uses by NBC and/or, as a matter of law, Baiul is or is likely to be damaged by one or more of the Unauthorized Uses by NBC.

When damages are awarded, "calculation of damages is the province of the jury." *Zeno v. Pine Plains Cent. School Dist.,* 702 F.3d 655, 671 (2d Cir. 2012) *quoting Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990).

As concerns a reasonable license fee for damages, Mr. Steve Martin testified that he was negotiating a most favored nations deal with Mr. Disson for Baiul and that in connection with Baiul, that would mean equal treatment in terms of pay, transportation, hotels, etc. (A-945:12-24). Mr. Disson was the highest paid under Section 4.A. of his Employment Agreement. (A-794). Under a most favored nations deal, Baiul would have been paid the same as Mr. Disson for the Services but Baiul had no contract, was not paid anything and neither NBC nor the

Defendants have provided proof of payment to Baiul. (A-945:12-24; A-794; A-752:2-A-753:17; A-887). To date, NBC has exploited Baiul's trademark for free and this has caused damage to Baiul. (A-129; A-130; A-945:12-24; A-794; A-752:2-A-753:17; A-887).

False advertising damages Baiul's ability to obtain: bookings for subsequent skating shows, paid performances, sponsorships, product endorsements, commercials, television shows, feature films and/or other economic opportunities. (A-16.25, ¶25). In the entertainment industry, when a figure skater, actress or entertainer does not show up for a scheduled, promoted and/or advertised show where they are a headliner or star, it can have a devastating effect on her career. (A-16.25, ¶25). It damages her ability to obtain: bookings for subsequent skating shows, paid performances, sponsorships, product endorsements, commercials, television shows, feature films and/or other economic opportunities. *Id*. Very few executives in the entertainment industry would ever want to hire a figure skater, actress or entertainer who has a reputation as a "no show" including Mr. Stephen Disson, the president of Disson, and the Defendants by their wrongful and illegal actions have caused Baiul to be labeled as a "no show". (*Id*.; A-811:2-21). Additionally, Defendants' actions presenting Baiul as a "no show" have caused and/or continue to cause Baiul great harm and financial loss. (A-955:6-A-956:10). Mr. Disson testified that he would not hire somebody that has a reputation as a "no

show" (A-811:2-21). Baiul has been labeled a "no show" and the phone has stopped ringing. (A-955:6-A-956:10).

"Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395 (1993). "Although it may be improper to rely on past sales as an indicator of future sales when a more accurate measure is available, there is no support for the contention that projections of past profits is improper as a matter of law." *Record Club of America, Inc. v. United Artists Records, Inc.,* 196 F.Supp. 940, 944 (S.D.N.Y 1988). Considerable time was spent during the deposition of Mr. Carlo J. Farina in order to correctly establish Baiul's actual and unrealized (or earned and due but unpaid) historical earnings in order to support her claim for lost future profits with A-889-A-908 being a substantial portion of Exhibit D used in Mr. Farina's deposition (A-889-A-908; A-933-A-944;). Baiul reasonably calculated her lost future profits over 10 years. (A-889-A-908).

There are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor of Baiul that Baiul is or is likely to be damaged by one or more of the Unauthorized Uses by NBC and/or,

as a matter of law, Baiul is or is likely to be damaged by one or more of the Unauthorized Uses by NBC.

Baiul requested a jury trial in this Action and is entitled to have a jury calculate her damages. *Zeno at 671 quoting Ismail at* 186; (A-16.32).

## STANDARD OF REVIEW

## ARGUMENT SECTION 4

The appellate standard of review is abuse of discretion. *Twin Peaks Productions, Inc. v. Publications International, Ltd.,* 996 F2d 1366, 1383 (2d Cir. 1993).

## ARGUMENT

**4.    Case 14-2892 - Action Not "Exceptional" within the Meaning of 15 U.S.C. § 1117[3]**

Baiul's claims have merit, were not brought for an improper purpose and were not pursued in a manner that rendered this action "exceptional" within the meaning of 15 U.S.C. § 1117.

However, the Court mistakenly agreed with NBC and held Baiul's claims to be ""inexcusably meritless" and her conduct "evidenced an ulterior motive for this litigation."" (A-1495-A-1496). The Court went on further to state "both the meritless nature of Baiul's claims coupled with the evidence of ulterior and

---

[3] For Case 14-2892, after considerable further research, Baiul has decided to only appeal this issue that had been listed on Baiul's Form C - Addendum B - No. 5.

improper motives is more than enough to satisfy the necessary showing of bad faith under § 1117(a)." (A-1499). This ruling is shocking and bizarre in that it is inconsistent with the authorities and inconsistent with the evidence in the record that proves that the Defendants committed no less than 26 Total Uses (with NBC committing no less than 5 in the two Unauthorized Uses) while Baiul had to comply with the statute of limitations in order to timely bring her claims for the Total and/or Unauthorized Uses under New York Civil Rights Law § 51. *Nussenzweig v. Dicorcia,* 9 N.Y.3d 184 (2007). The necessity of Plaintiff to use reasonable diligence to comply with the applicable statute of limitations surely cannot be held to be an ulterior motive. *Id.*

In the Application section of its Decision, the Court appears to rely exclusively upon *Juicy,* a 2006 District Court decision, to support its decision that "Baiul chose to use this litigation as a forum to achieve her objectives in other lawsuits when she had no valid claim of injury based on the claims actually alleged in this Court." (A-1498); *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* 2006 WL 2591478 at *7 (S.D.N.Y. 2006). But *Juicy* is readily distinguishable from this Action. In *Juicy*, plaintiff was found to have used litigation to achieve a commercial objective when it had no valid claim of injury and was seeking leverage in the negotiation of a licensing agreement or entry into a new market and it knew that its claims were devoid of merit. *Id*. In contrast to *Juicy*, Baiul in this

Action has a valid claim of injury in that the Defendants committed no less than 26 Total Uses (with NBC committing no less than 5 in the two Unauthorized Uses) and for none of which was Baiul paid anything. *Id*.; (See Facts *Supra*). It is not asserted or held that Baiul was seeking leverage in the negotiation of a licensing agreement or entry into a new market like in *Juicy* but rather that Baiul allegedly chose this litigation to achieve her objectives in other lawsuits. (A-1498). However, the reality is absolutely to the contrary.

Baiul served her FRCP 26 disclosures and provided NBC with her supporting documents. (A-889-A-895; A-908-A-909). These documents were filed in opposition to NBC's motion for summary judgment. *Id*. Baiul needed to establish damages in this Action. The Court is critical of Baiul for sending subpoenas to third parties in an attempt to substantiate damages in this Action but what other option did Baiul have when Baiul did not personally have supporting documents for some of her actual and unrealized (or earned and due but unpaid) historical earnings? (A-1497). The fact that the parties subpoenaed (for various reasons including pending litigation) provided nothing that was not already included in Baiul's disclosures explains why there was nothing further to share with NBC. But the Court is wrong in stating that this is an "after-the-fact justification" when these same FRCP 26 disclosures and supporting documents were already in the record in opposition to NBC's motion for summary judgment

42

and Baiul had claimed lost future profits or "lost earnings, and lost potential earnings" in the complaint. (A-1498; A-889-A-895; A-908-A-909; A-16.27, ¶32).

The record establishes that Baiul is or is likely to be damaged by the Unauthorized Uses. (*See* Section 3 *Supra*). For example, Baiul was labeled a "no show" and even Mr. Stephen Disson testified that he would not hire a no-show. (A-1119). "Damages resulting from the loss of **future profits** are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395 (1993). "Although it may be improper to rely on past sales as an indicator of future sales when a more accurate measure is available, there is no support for the contention that projections of past profits is improper as a matter of law." *Record Club of America, Inc. v. United Artisits Records, Inc.,* 196 F.Supp. 940, 944 (S.D.N.Y 1988). In order to correctly establish Baiul's actual and unrealized (or earned and due but unpaid) historical earnings in order to support her claim for lost future profits in this Action, Baiul reasonably required considerable financial information from NBC and third parties. (A-889-A-895; A-908-A-909).

The fact that Baiul may have had or would have in the future other actions against persons who were served with subpoenas is irrelevant since the financial

information requested was necessary and relevant for Baiul in order to support her claims for lost future profits in this Action and this clearly differentiates this Action from the behavior of the plaintiff in *Juicy. Juicy at* \*7. The plaintiff in *Juicy* had no necessary and relevant basis for its actions internal to that litigation unlike Baiul who did have internal to this Action. *Id*.; (A-889-A-895; A-908-A-909).

In *Momentum,* the court refused to grant attorney's fees under 15 U.S.C. § 1117(a), even though the claims were found to be meritless, because the plaintiff believed it owned the trademark rights in "Momentum". *Momentum Luggage & Leisure Bags v. Jansport, Inc.,* 2001 WL 1388063 at \*7 (S.D.N.Y. 2001). (The court also noted that any sanctions to be imposed against the attorney would be modest in light of his solo practice and refused to award sanctions under 28 U.S.C. § 1927.) There is no assertion in this Action that Baiul does not own the trademark rights to her own name "Oksana Baiul". The record evidence establishes that there were no less than 26 Total Uses by the Defendants (with NBC committing no less than 5 in the two Unauthorized Uses) so Baiul's claims are not meritless nor brought in bad faith. (*See* Facts *Supra*).

Furthermore, on May 22, 2013, NBC again admitted the falsity of the Press Release but informed Baiul that it was making a Rule 68 offer while also threatening Rule 11 sanctions. (A-1162). After discussion with her counsel who is in solo practice, Baiul refused. (A-1168). While not dispositive, the fact that NBC

44

was making a Rule 68 offer (whether or not genuine in light of subsequent unfounded, extortion allegations) would tend to indicate that Baiul's claims were not completely meritless contrary to what the Court has held. (A-1162).

The Court proceeded to cite as authority *IMAF, Viola and Potamkin* in support of the imposition of attorney's fees jointly and severally against Baiul and her counsel but these cases are drastically different than this Action and in fact all support the position that no attorney's fees should be awarded to NBC in this Action. *IMAF, S.p.A. v. J.C. Penney Co., Inc.,* 810 F.Supp. 96, 100 (S.D.N.Y. 1992); *Viola Sportswear, Inc. v. Mimum,* 574 F.Supp. 619, 621 (E.D.N.Y. 1983); *United States v. Potempkin Cadillac Corp.,* 689 F.2d 379 (2d Cir. 1982).

*IMAF* held that "IMAF could not establish consumer confusion because the Adiansi name had never been established in the United States." It was this failure to establish consumer confusion by IMAF that raised a question as to IMAF's good faith. *Id.* However, the record in this Action proves that Baiul is indisputably a world-wide name (unlike "Adiansi" in *IMAF*) so any lack of good faith based upon *IMAF* is inapplicable to this Action. *IMAF at* 100; (A-1124, footnote 20).

In *Viola* the court held a claim of "a nationwide trademark conspiracy based upon the discovery of one pair of jeans worth $10, without more, can hardly be said to be well grounded in fact and can appropriately be characterized as a charge that is frivolous and in support of which a good faith argument on the merits could

45

not be made." *Viola* at 621. In this Action, Baiul has proven in the record 26 Total Uses (with NBC committing no less than 5 in the two Unauthorized Uses) so *Viola* is drastically different and inapplicable to this Action. *Id*.; (*See* Facts *Supra*).

*Potempkin* related to attorney's fees and costs for filing what the court deemed to be a frivolous appeal and the Court states that the ""attorney and client are in the best position between them" to determine who caused the litigation conduct at issue". *Potempkin at* 382. But Potempkin was held to be "totally lacking in merit, framed with no relevant supporting law, conclusory in nature, and utterly unsupported by the evidence." *Id*. In this Action, Baiul has proven in the record 26 Total Uses (with NBC committing no less than 5 in the two Unauthorized Uses) so *Potempkin* is drastically different and inapplicable to this Action. *Id*.; (*See* Facts *Supra*).

Additionally, *Louis Vuitton* and *Guess? v. Gold Center Jewelry* both appear to indicate that a willful infringement is required in order to award attorney's fees. *Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 111 (2d Cir. 2012); *Guess? v. Gold Center Jewelry,* 997 F.Supp. 409, 412 (S.D.N.Y 1998).

In this Action, Baiul has not willfully infringed upon anything. The Lanham Act portion of the decision and order by the Court are based only upon the Court's holding that many of the uses do not constitute uses by the Defendants, "and those

that do are plainly not uses in commerce" and that Baiul failed to show that "she is or is likely to be damaged by defendants' allegedly false designations of origin concerning the Disson Shows." (A-1112-A-1120). Baiul proved the existence of the 26 Total Uses (with NBC committing no less than 5 in the two Unauthorized Uses). (A-111-A-115; A-116-A-120; A-121-A-123; A-124-A-126; A-129; A-130; A-699-A-713; A-715-A-730; A-732-A-740; A-742-A-745; A-747-A-750). The record shows that the press release for the broadcast was posted on NBC's website. (A-129). The record shows that the press release for the broadcast was picked up and posted on the Entertainment Hotline website. (A-130). The record shows that the press release was false. (A-1107). Issues upon which Baiul and the Court differ, in accordance with the decision and order, are whether the Unauthorized Uses were "in commerce" or not under the Lanham Act. (*See* Section 1 *Supra*). Furthermore, Baiul respectfully believes that the Court erred on the issue of damages as explained in Section 3 *Supra* and even the Court cannot argue with the fact that Baiul's name was repeatedly used but Baiul was not paid. (*See* Section 3 *Supra*). Thus this Action differs considerably from *Juicy, IMAF, Viola and Potempkin* in that it is not meritless, there is no ulterior motive and there is no bad faith by Baiul or her counsel. *Juicy at* *7; *IMAF at* 100; *Viola at* 621; *Potempkin at* 382.

47

Baiul's claims have merit, were not brought for an improper purpose and were not pursued in a manner that rendered this action "exceptional" within the meaning of 15 U.S.C. § 1117 and the order of the Court should be reversed.

## STANDARD OF REVIEW

## ARGUMENT SECTION 5

The appellate standard of review is abuse of discretion. *Twin Peaks Productions, Inc. v. Publications International, Ltd.,* 996 F2d 1366, 1383 (2d Cir. 1993).

## ARGUMENT

**5.     Case 14-3339 - Award of Attorney's Fees[4]**

The Court, in its stated "exercise of its considerable discretion", erred as a matter of law since the Court only had "some limited discretion to make exceptions to the hard-and-fast rule" in awarding attorney's fees of $98,540.08 in total to NBC under 15 U.S.C. § 1117(a) for Lanham Act claims, non-Lanham Act claims, a non-Lanham Act related case and/or an unrelated case where NBC had failed to provide the required, complete, contemporaneous records indicating, for each attorney, the date, the hours expended, and the nature of the work done.

NBC's alleged fees are unreasonable and purely speculative and should be disallowed entirely as is required by *Carey* and *Scott. New York State Association*

---

[4] For Case 14-3339, after considerable further research, Baiul has decided to only appeal this issue that had been listed on Baiul's Form C - Addendum B - No. 2.

*For Retarded Children, Inc., v. Carey,* 711 F.2d 1136, 1154 (2d Cir. 1983); *Scott v. City of New York,* 626 F.3d 130, 133-134 (2d Cir. 2010).

*Carey* has been the law since 1983 and it states:

"All applications for attorney's fees, whether submitted by profit-making or non-profit lawyers, for any work done after the date of this opinion should normally be disallowed unless accompanied by contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." *Carey* at 1154.

NBC has failed to provide complete, contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done with the required specificity. (A-1512-A-1582). While the Court understood that NBC had failed to comply with Carey and Scott, the Court inexplicably attempts to rely upon *Scott* in support of its decision that it may exercise "limited discretion to make exceptions to the hard-and-fast rule." (A-1596 quoting *Scott* at 133). But *Scott* is an affirmation and explanation of *Carey* and states:

"Thus read, *Carey* sets out unequivocally that absent unusual circumstances attorneys are required to submit contemporaneous records with their fee applications. The permissive language at the end of the opinion recognizes that exceptions to the rule may exist. The strength with which we articulated the

general rule, however, signals that any possible exceptions are minimal and limited in scope. In other words, *Carey* establishes a strict rule from which attorneys may deviate only in the rarest of cases. Indeed, after *Carey* there are few examples of this court permitting a district court to award fees in the absence of full contemporaneous records. Where we have allowed for such a recovery, counsel has always maintained at least *some* contemporaneous records. *See Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986) **\*134** (affirming award of partial fees where contemporaneous records were maintained but not produced); *Carrero v. N.Y.C. Hous. Auth.,* 685 F.Supp. 904, 908–09 (S.D.N.Y.1988), *aff'd in relevant part* 890 F.2d 569, 582 (2d Cir.1989) (same); *Nu–Life Constr. Corp. v. Bd. of Educ. of the City of New York,* 795 F.Supp. 602, 606 (E.D.N.Y.1992) (allowing fees for hours supported by contemporaneous records, but denying recovery for unsupported hours), *aff'd in relevant part sub nom. Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1343 (2d Cir.1994). While we can imagine rare circumstances where an award of fees might be warranted even in the total absence of contemporaneous records—such as where the records were consumed by fire or rendered irretrievable by a computer malfunction before counsel had an opportunity to prepare his application—the circumstances justifying such an exception would have to be found by the awarding court and laid out in sufficient detail to permit review of the justification on appeal." *Scott* at 133-134.

NBC has not claimed any fire or computer malfunction that destroyed its contemporaneous time records (rare circumstances where an award of fees might be warranted under *Carey* and *Scott* even in the total absence of contemporaneous records) but rather that NBC does not have hourly billing software. *Scott at* 134; (A-1515, ¶17). However, on May 22, 2013, NBC sent Plaintiff a letter indicating that NBC would be serving Plaintiff with a formal Offer of Judgment pursuant to Federal Rule of Civil Procedure 68 and acknowledging that NBC would be entitled to collect its attorneys' fees and costs in the event that Plaintiff ultimately obtained an award against NBC that was less than the Rule 68 offer. (A-1164).

Plaintiff has provided the above background concerning knowledge by NBC about the possibility of being awarded attorney's fees from the time of serving the formal Offer of Judgment pursuant to Federal Rule of Civil Procedure 68 because it is critical to the issue of NBC's failure to comply with the law concerning the provision of contemporaneous time records as is required under *Carey* and *Scott*. *Carey* at 1154; *Scott* at 133-134; (A-1164).

There exists at least one good legal billing program called "eBillity" that is free for 1-2 matters. (A-1590, ¶2). NBC can have no excuse that cost is the reason why it is unable to provide contemporaneous time records since it could easily have utilized "eBillity" for free in this Action and generated the legally required contemporaneous time records. (A-1590, ¶3). Likewise, NBC can have no excuse

that it was unaware concerning the possibility of being awarded attorney's fees since NBC's Formal Offer of Judgment pursuant to FRCP 68 provides for attorneys' fees in certain instances and NBC had notified Baiul specifically about this on May 22, 2013 which was soon after the litigation had commenced. (A-1164). Despite Ms. Talbert's 13 years of litigation experience and her claimed billing rate of $508.78 which the Court somehow found reasonable, she and NBC just chose not to maintain contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done with requisite specificity even though such are clearly required by law under *Carey* and *Scott*. *Scott* at 133-134; *Carey* at 1148, 1154; (A-1597-A-1598).

Instead of contemporaneous time records, NBC has provided a collection of documents largely created after the fact in an attempt to establish some basis for its claim. (A-1512-A-1582). Even these documents submitted by NBC do not have the required specificity to be acceptable by the Court and do not adequately support a claim by NBC for any of the 215.2 hours of work alleged. As stated in *Ragin*, the requirement for specificity is not met by entries such as "research for brief", "research and draft brief", "draft and edit brief", "prepare correspondence" and "review correspondence", "telephone call to S. Berger," "Review Macklowe files," "conference with T. Holman," "Telephone conference," "letter to Suzanne Berger," "research," "Telephone conference with Holman and Berger," "working

travel to NY," "phone calls to NY," "continue to work on reply brief," "Research for reply brief." *Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 520 (S.D.N.Y 1994) (citing *Orshan v. Macchiarola,* 629 F.Supp. 1014, 1019 (E.D.N.Y. 1986)).

NBC's claims 69.4 hours on NBC Exhibit C and alleges that 63.7 of these hours were recorded on a contemporaneous basis. (A-1516, ¶19.a.). But such entries as: "TC w. S. Kada re: Baiul discovery", "Mtg. w E. Alicea, research, drafting", "Legal/factual research, drafting motion for attorneys' fees and costs" and "Preparation of mem. of law and fee submission" (6 identical entries claiming 24.9 hours) are excessively vague and all entries on NBC Exhibit C must be disallowed under *Carey* and *Ragin. Carey* at 1148; *Ragin* at 520; (A-1528-A-1529). The court in *Carey* specifically disallowed all fees related to the fee application because of the movant's failure to keep contemporaneous records and NBC asserts that 63.7 hours were spent on its motion for attorney' fees and costs so all 63.7 hours must also be disallowed under *Carey. Carey* at 1148; (A-1528-A-1529; A-1516, ¶19.a.). NBC's purported Westlaw back-up in NBC Ex. E is even more vague. (A-1531-A-1581). NBC has submitted 51 pages of documents that purport to show that NBC spent 37.4 hours researching something but we cannot be certain of what or even for what matter. (A-1531-A-1581). NBC is claiming 37.4 hours of allegedly billable work in NBC's Exhibit F and attempts to create

what looks somewhat like a time sheet but again has only excessively vague entries such as "Opp. to Plaintiff's Mot. to Amend" and "Mem. in Supp. of Summary Judgment" that must be disallowed under *Carey* and *Ragin*. *Carey* at 1148; *Ragin* at 520; (A-1582). It appears that all of the above was done by NBC because no contemporaneous time records (Baiul asserts that even NBC's alleged contemporaneous time records in NBC Ex. C are not standard, contemporaneous time records with the requisite specificity and appear as if they were done in Excel or Word) were kept as required by *Carey* and *Scott*. *Carey* at 1148, 1154; *Scott* at 133-134; (A-1528-A-1529; A-1587, ¶1). Additionally, how could NBC possibly claim to spend 215.2 hours (for many of these hours there is no support other than Ms. Talbert's declaration which is clearly insufficient under *Carey* and they must be disallowed) on the total action but 63.7 hours just on attorneys' fees and costs? Almost 30% (63.7 hours / 215.2 hours) of NBC's alleged hours spent on this Action was in hours trying to calculate how many hours NBC had spent on this Action but amazingly, these hours allegedly spent trying to calculate hours allegedly spent is the only documentation that NBC alleges is contemporaneous and these 63.7 hours must be disallowed under *Carey*. *Carey* at 1148. (A-1516, ¶19.a.).

This Court went even further to deny Baiul's opposition to NBC being awarded attorney's fees in the Disson Action (Case No. 13-cv-02208) and in

Plaintiff's state court action against NBC concerning The Nutcracker On Ice 1 and The Nutcracker On Ice 2 (Index No. 654420/2013) ("Nutcracker Action") because Baiul's argument "is completely unsubstantiated" or in other words, it is somehow Baiul's obligation to substantiate how many hours are incorrectly billed by NBC even though NBC did not provide Baiul complete, contemporaneous time records as required by *Carey* and *Scott*. *Carey* at 1154; *Scott* at 133-134; (A-1602). Nevertheless, NBC appears to be claiming hours unrelated to this Action. For instance, NBC claims .4 hours spent in the deposition of Ms. Barbara Ross. (A-1530). Ms. Ross is a reporter at the New York Daily News and her deposition had nothing to do with claims in this Action but rather concerned 16 claims of defamation in the Disson Action to which NBC is not a party. (A-1587, ¶2).

There are 16 claims in the Disson Action whereas there are only 5 claims (with one of these having been dismissed by Plaintiff) in this Action. (A-1587, ¶3). Calculating based upon the number of total claims, the amount of deposition time allocable to this Action is only just under 24% (5/21) with just over 76% (16/21) allocable to the Disson Action for which NBC cannot possibly be entitled to any fees but NBC wrongly alleges hours for all depositions including that of Ms. Ross. (A-1587, ¶4). If NBC had kept contemporaneous time records as required by *Carey* and *Scott* during the alleged 51.9 hours of depositions, NBC would have had to exclude many hours during such depositions that were spent on the Disson

55

Action to which NBC is not a party and is not entitled to any attorneys' fees. (A-1530). All alleged deposition hours should be disallowed under *Carey* and *Scott*. *Carey* at 1148, 1154; and *Scott* at 133-134.

The Court cites *Krear* as an authority and states that when a court makes an exception to the maintenance of contemporaneous time records throughout litigation, "it should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987). But *Krear* was a breach of contract case with the attorney's fees being decided under New York law and is thus inapplicable to this Action. *Id*. In stark contrast, this Action involves attorney's fees that are allowed, if at all, by a federal law and thus in accordance with *Scott*, *Carey* is the rule and there must be complete, contemporaneous time records. *Scott* at 133-134.

Recently in *Sub-Zero, Inc.*, Judge Wood affirmed *Carey* and stated "[i]n accordance with *Carey*, Sub-Zero has provided contemporaneous time-records for Mr. Simmons, Mr. Baum, and Mr. Brenner." *Sub-Zero, Inc.,* 2014 WL 1303434 at 10 (S.D.N.Y. 2014). But in this Action, NBC has unreasonably provided no contemporaneous time records with requisite specificity and NBC's motion for attorneys' fees and the award should have been denied in its entirety under both *Carey* and *Scott*. *Carey* at 1148, 1154; *Scott* at 133-134.

NBC claims that it expended a minimum of 215.2 hours in this Action but this is clearly untrue. Many, many of these 215.2 hours were spent by NBC on the Disson Action for which NBC is entitled to no fees and is not even a party or even possibly some hours might have been spent on the Nutcracker Action. (A-1587-A-1588, ¶2-5). It is not the Plaintiff's fault that NBC failed to keep the contemporaneous time records required by *Carey* and *Scott*. *Carey at* 1154; *Scott at* 133-134. NBC has the burden of proving the fees that it claims. *Carey at* 1154; *Scott at* 133-134. NBC has not met the burden required by both *Carey* and *Scott* and has not met the specificity required by *Ragin* and *Carey*. *Ragin at* 520; *Carey at* 1148.

However, if this Court were for some reason to totally disregard the authorities of *Carey* and *Scott* and deny Baiul's other issues on appeal which would effect the award of attorney's fees*,* which it should not, NBC should be entitled to no more than 35.96 hours ((215.2 total hours claimed - .4 hours for Ross - 63.7 hours spent trying to calculate hours) * 23.8% percentage of total claims - 5 in the NBC Action and 16 in the Disson Action) at a rate of $200 per hour which would equal an attorney's fee award in total of $7,192.36 (35.96 hours*$200) and this would be generous since NBC has not even provided adequate documentation to satisfy the specificity requirement explained in *Ragin* and *Carey*. *Ragin at* 520; Carey *at* 1148. Furthermore, it would be reasonable since Baiul is an individual

and Baiul's attorney is a sole practitioner and it would provide no "windfall" to NBC. *See e.g., Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986)("[w]e note that given the underlying purpose of sanctions-to punish further violations-it lies well within the district courts discretion to temper the amount to be awarded against an offending attorney by a balancing consideration of his ability to pay.")

NBC has unreasonably failed to provide complete, contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done as is required by both *Carey* and *Scott. Carey* at 1148, 1154; *Scott* at 133-134. NBC has additionally failed to provide adequate documentation to satisfy the specificity requirement explained in *Carey* and *Ragin. Carey* at 1148; *Ragin* at 520. NBC has not claimed any fire or computer malfunction that destroyed its contemporaneous time records that might have provided an exception to the requirements of *Carey* and *Scott. Scott* at 133-134. NBC has failed to provide any documentation or claims for costs other than attorney's fees and has thus waived them. Under the authorities of *Carey* and *Scott*, this Court should reverse in its entirety the Court's award of attorney's fees and costs and award NBC no attorney's fees or costs. *Carey* at 1148, 1154; *Scott* at 133-134.

## **CONCLUSION**

As concerns Case 14-1813, there are disputed issue(s) of material fact and/or evidence in the record from which a reasonable inference could be drawn in favor

of Baiul on all of Baiul's issues on this Appeal for Case 14-1813 and Baiul respectfully requests that the Court's final judgment that granted summary judgment for all Defendants and dismissed all of Baiul's claims be reversed as concerns NBCUniversal Media, LLC and that an order is issued for the Action to proceed to trial.

As concerns Case 14-2892, Baiul's claims absolutely have merit, were not brought for an improper purpose and were not pursued in a manner that rendered this action "exceptional" within the meaning of 15 U.S.C. § 1117 and the order of the Court should be reversed in its entirety.

As concerns Case 14-3339, the Court erred as a matter of law in awarding attorney's fees of $98,540.08 in total to NBC under 15 U.S.C. § 1117(a) for Lanham Act claims, non-Lanham Act claims, a non-Lanham Act related case and/or an unrelated case where the NBC had failed to provide the required, complete, contemporaneous records indicating, for each attorney, the date, the hours expended, and the nature of the work done and under the authorities of *Carey* and *Scott*, this Court should reverse in its entirety the Court's award of attorney's fees and costs and award NBC no attorney's fees or costs. *Carey* at 1148, 1154; *Scott* at 133-134.

Dated:    November 24, 2014
West Hollywood, California

Respectfully submitted,

/s/ *Raymond J. Markovich*
Raymond J. Markovich, Esq. (RM0919)
351 Westbourne Drive
West Hollywood, CA 90048-1909
(323) 401-8032
*Attorney for Appellant Oksana S. Baiul*

# CERTIFICATE OF COMPLIANCE

I hereby certify that in compliance with FRAP, Baiul's Brief is in 14 point Times New Roman typeface and is 13,622 words as calculated by the Word processing program.

Dated:  November 24, 2014
        West Hollywood, California


Respectfully submitted,

/s/ *Raymond J. Markovich*
Raymond J. Markovich, Esq. (RM0919)
351 Westbourne Drive
West Hollywood, CA 90048-1909
(323) 401-8032
*Attorney for Appellant Oksana S. Baiul*

# Special Appendix

i

## Table of Contents
## (Special Appendix)

**Page**

Opinion and Order of Honorable Katherine B. Forrest,
    Dated April 24, 2014.................................................................SPA-1

Memorandum Decision and Order of Honorable
    Katherine B. Forrest, Dated August 22, 2014,
    Appealed From......................................................................SPA-40

$\boxed{\textbf{SPA-1}}$

3UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  APR 24 2014
```

OKSANA S. BAIUL,                         :
                                         :
                     Plaintiff,          :        13 Civ. 2205 (KBF)
                                         :
           -v-                           :        OPINION & ORDER
                                         :
                                         :
NBCUNIVERSAL MEDIA, LLC, et al.,         :
                                         :
                     Defendants.         :
                                         :
------------------------------------------------------X
                                         :
OKSANA S. BAIUL and OKSANA, LTD.,        :
                                         :
                     Plaintiffs,         :        13 Civ. 2208 (KBF)
                                         :
           -v-                           :        OPINION & ORDER
                                         :
                                         :
STEPHEN DISSON, et al.,                  :
                                         :
                     Defendants.         :
                                         :
------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        Before this Court are several lawsuits brought by Oksana Baiul ("plaintiff" or

"Baiul") against a variety of entities—including agents, networks, producers,

coaches, and accountants—that seek millions of dollars in damages for events that

took place as recently as within the last two years and as long ago as the last two

decades.  This Opinion & Order relates to two of those lawsuits; the first suit arises

out of alleged commercial uses of Baiul's name and likeness to promote two skating

shows in which she never participated, while the second arises out of allegedly

defamatory statements about the first lawsuit as reported by two New York City-

SPA-2

area newspapers.  Before the Court are motions for summary judgment seeking the dismissal of these two suits.

For the reasons set forth below, these suits are wholly without merit, defendants' motions for summary judgment are GRANTED, and these actions are DISMISSED.

I.    PROCEDURAL HISTORY

On February 1, 2013, Baiul filed suit against NBC Universal Media, LLC and NBC Sports Network, LP (the "NBC Defendants") and Disson Skating, LLC in New York State Supreme Court, New York County, for violations of the Lanham Act, 15 U.S.C. § 1125(a), and New York Civil Rights Law § 51, as well as common law fraud and negligent misrepresentation (hereinafter, the "Lanham Act Action").  (Lanham Act Action Notice of Removal, Ex. B ¶¶ 28-61, ECF No. 1.)[1]  The Lanham Act Action was removed by Disson Skating, LLC to this Court on April 3, 2013.  (Id. ¶¶ 1-4.)

On February 26, 2013, Baiul[2] filed suit against Stephen Disson and Disson Skating, LLC (the "Disson Defendants") in New York State Supreme Court, New York County, for libel (hereinafter, the "Libel Action").  (Libel Action Notice of Removal, Ex. B ¶¶ 46-221, 13 Civ. 2208, ECF No. 1.)  The Libel Action was removed by the Disson Defendants on April 3, 2013 (id. ¶¶ 1-7), and this Court accepted it as related to the Lanham Act Action on April 8, 2013.

---

[1] Unless otherwise specified, all ECF references in this Opinion correspond to the docket in the Lanham Act Action, 13 Civ. 2205.
[2] Though both Oksana S. Baiul and "Oksana Ltd." are named as plaintiffs in this action, the Court hereinafter refers to both interchangeably as either "Baiul" or "plaintiff" for the sake of simplicity.

2

By order dated May 1, 2013, fact discovery in both actions was scheduled to close on August 30, 2013. At a status conference on August 29, 2013, plaintiff's counsel stated, for the first time, his desire to amend the complaints in both actions. Following motions to amend the complaints pursuant to Rule 15, the Court granted plaintiff's motion to amend the complaint in the Libel Action on consent in light of the fact that the only change to be made was a change to the damages amount listed in the complaint that had been previously provided to the Disson Defendants in discovery. (9/24/13 Order, 13. Civ. 2208, ECF No. 25.) The Court denied plaintiff's motion to amend in the Lanham Act Action because, "[o]n a substantive level, such amendment would be futile as the allegations set forth in the proposed amended complaint fail to allege sufficient facts to support a claim of successor liability" and "the amendment comes at too late a stage in these proceedings" such that defendants would be prejudiced. (9/24/13 Order, ECF No. 29.)

On October 24, 2013, defendants in both actions moved for summary judgment seeking dismissal of the operative complaints. Plaintiff opposed the motions,[3] and the motions became fully briefed on December 16, 2013.[4]

II.    FACTS

In support of their motion for summary judgment, the NBC Defendants submitted a statement of material facts pursuant to Local Civil Rule 56.1 ("NBC

_____

[3] Because plaintiff failed to timely oppose the motions or to otherwise comply with the Court's rules or the Local Civil Rules of this District, the Court only accepted certain filings in opposition to these motions. (See 12/4/13 Order, ECF No. 67; 12/5/13 Order, ECF No. 68.)
[4] Three weeks after the motions for summary judgment became fully briefed, plaintiff again moved for leave to file an amended complaint in the Lanham Act Action. The Court again denied plaintiff's motion as untimely. (1/6/14 Order, ECF No. 86.)

Case 14-3339, Document 39, 11/24/2014, 1377927, Page 73 of 119

SOF") (ECF No. 43), a response to Baiul's statement of additional facts pursuant to

Local Civil Rule 56.1 ("NBC RSOF") (ECF No. 82), and declarations from, inter alia,

Chelley Talbert ("Talbert Decl." and "Talbert Supp. Decl.") (ECF Nos. 34, 81). The

Disson Defendants also submitted a statement of material facts pursuant to Local

Civil Rule 56.1 ("Disson SOF") (ECF No. 44),[5] a response to Baiul's statement of

additional facts pursuant to Local Civil Rule 56.1 ("Disson RSOF") (ECF No. 79),

and declarations from, inter alia, Matthew DeOreo ("DeOreo Decl." and "DeOreo

Supp. Decl.") (13 Civ. 2208, ECF Nos. 36, 58). Subject to the limitations imposed by

the Court in light of multiple confusing and untimely filings,[6] Baiul submitted

oppositions and statements of additional material facts pursuant to Local Civil Rule

56.1 with respect to both the NBC Defendants ("Baiul-NBC SOF") (ECF No. 69) and

the Disson Defendants ("Baiul-Disson SOF") (ECF No. 62), as well as a declaration

from, inter alia, Raymond Markovich ("Markovich Decl.") (ECF No. 62-1).

Unless otherwise noted, there is no genuine dispute[7] as to the following

material facts.[8]

---

[5] Many of the filings by the Disson Defendants and Baiul in support of and in opposition to the
instant motions were filed in both the Lanham Act Action and the Libel Action (and often more than
once in each action). For the sake of simplicity, the Court cites to only one copy of these filings in
this Opinion.

[6] These issues are described in further detail in the Court's December 4 and 5, 2013 orders. (See
ECF Nos. 67-68.)

[7] The Court notes that many of Baiul's "objections" to defendants' statements of material facts are
merely argument—assertions that certain facts should not be credited, are irrelevant according to
counsel's understanding of the law, or must be read in the context of other facts that are either
beside the point or are flatly contradicted by the record. This approach is insufficient to create
genuine issues of material fact as to these statements. See Hicks v. Baines, 593 F.3d 159, 166 (2d
Cir. 2010) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue
of material fact where none would otherwise exist.") (citations and internal quotation marks
omitted).

[8] The Court notes that Baiul does not oppose the vast majority of the facts put forth by the NBC
Defendants and the Disson Defendants in the manner prescribed by the local rules of this District

4

A.    <u>The NBC Defendants</u>

NBC Sports is the sports division of the NBCUniversal Media, LLC television network. (NBC SOF ¶ 1.) NBC Sports broadcasts a diverse array of sports programming, and produces or co-produces hundreds of hours of original sports programming a year. (<u>Id.</u> ¶¶ 2-3.) NBC Sports sells hundreds of hours of broadcast time annually to third-party producers, so that they can air their sports programming on the NBC broadcast television network ("NBC") or the NBC Sports channel. (<u>Id.</u> ¶ 4.) NBC Sports airs over nine thousand hours of sports programming annually on NBC and the NBC Sports channels combined. (<u>Id.</u> ¶ 5.) Advertising for programming produced by NBC Sports is one of the primary sources of revenue for NBC Sports. (<u>Id.</u> ¶ 6.)

B.    <u>The Disson Defendants</u>

Disson Skating, LLC ("Disson"), organized under the laws of Virginia, is a third-party producer that purchases broadcast time from NBC Sports to air pre-packaged programming on NBC. (NBC SOF ¶ 12; Disson SOF ¶ 4.) Disson produces, among other things, figure skating shows, which have aired on NBC, CBS, ESPN, USA, Bravo, Hallmark Channel, TBS, Style, and Ovation. (NBC SOF ¶¶ 13-14.) Stephen Disson is a skating producer and principal of Disson. (Disson SOF ¶ 3.) Disson came into existence in March 2012; prior to March 2012, and at

---

(even in the later, untimely filings that the Court has reviewed but determined not to consider for purposes of these motions). <u>See</u> Local Civil Rule 56.1(b) ("The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."). Accordingly, these facts are deemed admitted for the purposes of these motions. <u>See</u> Local Civil Rule 56.1(c).

SPA-6

the time of the events relevant to the Lanham Act Action, a separate limited

liability company called Disson Skating, LLC of Pennsylvania ("Disson PA") was in

operation. (Disson SOF ¶¶ 4-5, 7.)[9]

The format for a Disson figure skating show includes figure skating

performances by a number of Olympic, world, or national figure skaters and a live

musical act. (NBC SOF ¶ 15.) Disson figure skating shows are taped before a live

ticket-buying audience for later broadcast on a national television network. (Id. ¶¶

16-17.) Disson has purchased broadcast time from NBC Sports to broadcast its

figure skating shows on NBC since 1989. (Id. ¶ 18.)

C.    Oksana Baiul

Baiul is a world famous figure skater who won the 1993 World

Championship, Ladies Figure Skating and became the 1994 Olympic Gold Medalist

in Ladies Figure Skating. (Disson SOF ¶ 1.) According to Baiul, she is "the highest

figure skater who's been on TV and my Olympics were the highest rated Olympics."

(DeOreo Decl. Ex. G at 382.) Baiul notes that she has "a title given to me by the

media queen of the ice," and she considers herself a "superstar," and a "global

entertainer." (Id. Ex. G at 382, 424.)

"Oksana Ltd." is a Pennsylvania corporation that is 100% owned by Baiul; it

is the legal entity that has and continues to be used by Baiul for some or all of her

contracts and business. (Disson SOF ¶ 2.)

---

[9] For the sake of simplicity, the Court refers to both Disson entities as "Disson" herein. In light of the Court's holdings in Sections IV and V, infra, the Court need not reach the issue of successor liability in order to dismiss the complaints in both actions.

6

SPA-7

D.   The 2010 Time-Buy Between NBC Sports and Disson

When selling broadcast time to third-party producers, NBC Sports frequently enters into "time-buy agreements" with the third-party producer.  (NBC SOF ¶ 7.) A time-buy agreement is when a third-party producer purchases time to broadcast its show on an NBC network and takes on the responsibility of production, marketing, and sale of the program (hereinafter, a "Time-Buy").  (Id. ¶ 8.)

In Time-Buys, the third-party producer recoups its investment by selling advertising to insert in the program and then retaining the proceeds of those sales. (Id. ¶ 9.)  Ratings from shows broadcast under Time-Buy agreements do not factor into overall network ratings, though the shows may contain a few minutes of on-air promotion for future NBC telecasts during a two-hour show.  (Id. ¶ 10; Baiul-NBC SOF ¶ 70.)  Third-party producers who have entered into a Time-Buy are required to submit commercials and advertisements to NBCUniversal's standards department 72 hours before a broadcast.  (NBC SOF ¶ 12.)

Disson and NBC Sports entered into a Time-Buy agreement dated March 2010, which was amended on September 16, 2010 (the "2010 Time-Buy").[10]  (Id. ¶ 19.)  The 2010 Time-Buy covered Disson's purchase of broadcast time for the 2010-2011 and 2011-2012 seasons.  (Id. ¶ 20.)  Disson contracted to purchase a minimum of sixteen hours of broadcast time in both the 2010-2011 and 2011-2012 seasons, which corresponded to at least eight, two-hour figure skating shows.  (Id. ¶¶ 21-23.) Disson agreed to pay NBC Sports $400,000 per two-hour show, regardless of the

_____

[10] The Court rejects Baiul's repeated characterizations of the 2010 Time-Buy as a "co-production" agreement as lacking both a factual and legal basis.

7

identity of the figure skaters or musical acts that actually performed in each show.
(Id. ¶¶ 24-27.)  The 2010 Time-Buy was amended to add a ninth one-hour show in
the 2010-2011 season at an additional cost to Disson of $200,000.  (Id. ¶ 28.)

Under the 2010 Time-Buy, Disson was responsible for all elements of
production of the live figure skating show, including taping the show for television
broadcast.  (Id. ¶¶ 29-31.)  Disson represented and warranted to NBC Sports that it
had obtained the necessary rights for the performances, including the featured
figure skater talent and music.  (Id. ¶ 38.)  Disson hired IMG, an independent
contractor, to produce the shows; IMG was also responsible for the post-production
work on the taped shows.  (Id. ¶¶ 32-33.)  Aside from payment of on-air talent by
NBC Sports, Disson was responsible for all other production costs, expenses, and
liabilities of the figure skating shows covered by the 2010 Time-Buy.  (Id. ¶ 34;
Markovich Decl. Ex. 35 at NBCU 00009.)  Disson selected the figure skaters that
appeared in each figure skating show, and conducted all negotiations in connection
with their appearance.  (NBC SOF ¶¶ 35-36.)  NBC Sports was not a party to
Disson's agreements with either the figure skaters, IMG, or the venues.  (Id. ¶ 37.)

Once post-production work was complete, Disson (or IMG) delivered a tape of
the show to the NBC Sports production department on the Thursday or
Friday before the scheduled weekend broadcast.  (Id. ¶ 39-40.)  A member of the
NBC Sports production department reviewed the tape to confirm it was appropriate
for air; this included confirming that the tape complied with production
requirements, such as requisite audio quality and appropriate number and length of

SPA-9

commercial spots, and fact-checking to ensure any on-screen graphics were accurate. (Id. ¶ 41.)

Disson was entitled to sell advertisements to insert in each program in the form of commercials, billboards, and vignettes, without any limitations as to price. (Id. ¶¶ 42-43.) Disson retained all proceeds from any advertisements, commercial elements and sponsorships it sold. (Id. ¶ 44.) The fee Disson paid NBC Sports was not dependent on Disson's ability to sell advertising for any particular broadcast or on any other variable. (Id. ¶ 46.) NBC Sports did not participate in any conversations with advertisers, review any agreements Disson reached with advertisers, or otherwise participate in any attempts to solicit advertisers for any broadcasts covered by the 2010 Time-Buy. (Id. ¶ 47.)

One to two minutes during the two-hour broadcast were reserved for the insertion of an announcement for upcoming NBC network telecasts. (Id. ¶ 48.) One to two minutes were also reserved for the insertion of commercials sold by local NBC affiliates (which were not sold against the content of the program). (Id. ¶ 49.) NBC Sports did not discuss the content of the Disson programs with the local stations. (Id. ¶ 50.)

NBC Sport's only commitment to promote the broadcasts was "on-air in NBC Sports programming in accordance with NBC Sports' usual and customary practices and consistent with NBC Sports' promotion of similar sports programming." (Id. ¶ 53; Talbert Decl. Ex. 5 at NBCU 00013.) NBC Sports' promotion of the broadcasts was typically limited to a "lead-in" voiceover or vignette created by the NBC Sports

9

production department, which aired at the end of the preceding show and

encouraged viewers to remain on the channel to watch the upcoming Disson

broadcast. (NBC SOF ¶ 54.)

E.    Baiul's Interactions with Steve Martin and Disson in 2011

In May 2011, Baiul and her publicist Sarah Hall met with Steve Martin

regarding Martin potentially becoming Baiul's agent. (Disson SOF ¶ 9.) Martin is

an agent for The Agency Group and has worked as an agent for approximately

twenty years. (Id. ¶ 8.) Baiul had previously been "retired for a bit" and was

looking to "re-enter the skating world"; she had only performed in "a couple" paid

skating shows between 2006 and 2011 (one in 2010, none in 2011). (Id. ¶¶ 9-11.)

During the meeting, Baiul and Martin discussed the fact that Martin, on behalf of

Baiul, would find work for Baiul in skating shows in the United States. (Id. ¶ 12.)

Baiul and Martin discussed the possibility of Baiul performing in skating shows

produced by Disson; Martin asked Baiul what she thought of Stephen Disson's

shows, and Baiul indicated that "a lot of people like me were not doing his shows."

(DeOreo Decl. Ex. G at 71-73.)

Following this meeting, as of June 2011, Martin understood Baiul to have

hired him as her agent; Martin believed he had authority to negotiate skating deals

for Baiul and to commit her to such deals. (Disson SOF ¶¶ 15-16.) According to

Martin, he had a verbal agreement with Baiul but not a written contract. (See

Markovich Decl. Ex. 73 at 98-104.) At this time, Baiul was aware that Martin was

speaking to Disson and other skating show producers on her behalf, and never told

10

Martin not to do so. (Disson SOF ¶ 18.) In fact, in July 2011, Baiul expected that Martin would be receiving offers from skating show producers for her to perform in such skating shows. (Id. ¶ 19.)

On June 22, 2011, Martin emailed Stephen Disson and indicated that he was working with Baiul, who would be skating in two skating shows that were being produced by two other producers. (Id. ¶¶ 20-21.) During a conversation on July 12, 2011, Martin told Disson that he had signed Baiul as a client and that Baiul wanted to know if he had space for her in any of his NBC skating shows. (Id. ¶ 22.) During the same conversation, Disson offered Martin a deal for Baiul to perform in two of Disson's upcoming shows under the 2010 Time-Buy—a show with the band Styx in December 2011 in Greenville, South Carolina (the "Improv-Ice Show"), and a show with the recording artist Kenny G in January 2012 in the Seattle, Washington area (the "Moments of Love Show") (collectively, the "Disson Shows"). (Id. ¶ 23.) Disson and Martin discussed many of the details of the offer during this conversation, and Disson sent a follow-up email later that day to Martin setting forth many of these same details. (Id. ¶¶ 24-25.) Martin forwarded this email to Baiul the next day, July 13, 2011, and explained: "As we discussed, here are 2 more specials, these from Steve Disson . . . Both are offering $10,000+expenses. If you'd like me to arrange a call w/Steve, I'd be happy to." (DeOreo Decl. Ex. L.) According to Baiul, this email attached two documents containing certain background information about the Disson Shows, and which used Baiul's name and likeness; according to Martin, he did not recall opening the attachments to this email. (See Disson SOF ¶¶ 50-51.)

11

According to Martin, Baiul accepted this offer; according to Baiul, she had
additional questions about the amount of the offer.  (Id. ¶ 27; Baiul-Disson SOF ¶
27.)  Martin communicated his belief that Baiul had accepted the offer to Disson; in
a July 15, 2011 email, Martin stated that Baiul was "ok with the offers and wants to
have a creative conversation with you, as you +I [sic] discussed."  (DeOreo Decl. Ex.
E. at 28-29, Ex. N at DISSON 000826.)  Subsequently, on July 18, 2011, Martin's
assistant spoke to Baiul and confirmed that she had accepted Disson's offer;
Martin's assistant, who was authorized to convey this information on Martin's
behalf, emailed Disson that day and stated: "I spoke to Oksana, she has confirmed
she is good for both the NBC dates.  And confirmed she spoke to both yourself and
Lee Ann.  I will follow up with the contracts shortly."  (DeOreo Decl. Ex. O at
DISSON 000285, Ex. P at 19-21, 52-53, 60-64.)  Baiul and Disson also spoke on July
18, 2011 and discussed the shows; after the call, Disson emailed Martin and stated
"Just spoke at great length with Oksana and we are good to go here."  (DeOreo Decl.
Ex. C at 173-180, Ex. O at DISSON 000286.)

On July 20, 2011, Baiul emailed Martin that she was sick and could not
perform in any of the shows.  (Disson SOF ¶ 38.)  Baiul stated: "Steve I am werry
sorry I am werry suck I can't do this shows I am suck with my colitias.  So sorry."
(DeOreo Decl. Ex. Q.)  Martin responded: "I'm so sorry to hear you're not feeling
well.  What shows are you referring to?  Steve Dissons [sic] shows or all of them?
Hope you feel better."  (Id.)  In an email to Baiul dated August 7, 2011, Martin
stated: "I've notified the 3 producers of the skating events that you will not be

appearing for them, due to a health issue. At this point, I don't feel that myself or The Agency Group can effectively represent you. If any inquiries come to us, we will pass them along directly to you. I hope your health improves and wish you the best." (Id. Ex. S.)

Thereafter, on August 8, 2011, Martin emailed Disson and stated: "Please be aware that Oksana has informed me that she not [sic] going to perform at any of the skating shows she's agreed to, due to health reasons. Also, we are no longer representing Oksana. If you have any questions, feel free to call. Sorry for all the inconvenience." (Id. Ex R at 2.) This was the first time Disson learned that Baiul was not going to be in the Disson Shows. (Disson SOF ¶ 42.) In response to Disson's requests for an explanation as to why Baiul was no longer interested in participating in the Disson Shows, on August 12, 2011, Baiul stated in an email: "Steve the reason is I don't want to skate anymore!" (DeOreo Decl. Ex. T at 1.)

F.   The 2011-2012 Disson Skating Series

The eight shows in the 2011-2012 Disson skating series were filmed live from September 2011 through January 2012 and were broadcast on NBC through February 2012. (NBC SOF ¶ 70.) Over three dozen different figure skaters participated as skaters or hosts in the events, including U.S. Olympic gold medalists Brian Boitano, Kristi Yamaguchi, Peggy Flemming, and Sarah Hughes. (Id. ¶ 71.)

During the 2011-2012 skating show season, Disson retained an independent publicist, Lynn Plage, to promote its live events and the television broadcasts. (Id.

13

¶ 51.) Plage acted as a liaison between Disson and NBC Sport's communications department. (Id. ¶ 52.)

In April 2011, Disson sent the NBC Sports Programming department a preliminary plan for the 2011-2012 series. (Id. ¶ 72.) The one-page plan included the location of the live venue, broadcast date and time, and the proposed host and host fees for each show—it did not include the identity of any figure skater or musical act. (Id. ¶¶ 73-74.) Disson never sent a comprehensive list of figure skaters or musical acts for the 2011-2012 season to the NBC Sports programming department. (Id. ¶ 75.) NBC Sports first received comprehensive participant lists from Plage (on October 21, 2011); Plage sent those lists solely to the NBC Sports communications department. (Id. ¶ 76; Talbert Decl. Ex. 13.)

NBC Sports did not select, correspond with, or contract with the figure skating or musical talent that Disson engaged to perform in any show. (NBC SOF ¶ 60.) NBC Sports did not choose, communicate with, or collect any proceeds from the venues. (Id. ¶ 61.) NBC Sports played no role in the production of any show. (Id. ¶ 62.) NBC Sports did not participate in the advertising or promotion of, or collect any revenue from, the live events, ticket sales, or merchandise. (Id. ¶ 63.) NBC Sports did not solicit or engage with sponsors or advertisers for any broadcast or receive any revenue for advertising or sponsorships sold against the broadcasts. (Id. ¶ 64.)

The venues hired by Disson paid for and handled all advertisements associated with the Disson Shows; none of those advertisements (which Disson

reviewed and approved) included Baiul's name. (Disson SOF ¶¶ 56, 58, 74, 107-110.) On July 14, 2011, Disson sent the BI-LO Center, the venue for the Improv-Ice Show, a background information packet that listed Baiul as a "Suggested Skater." (Id. ¶ 86.) There is no evidence in the record to suggest that individuals at the BI-LO Center sent this packet or any other materials referencing Baiul to anyone in promoting the Improv-Ice Show. (Id. ¶¶ 87-89.)

On July 21, 2011, after Baiul had committed to the Improv-Ice Show but before Disson learned that she would not be participating, Disson emailed Jackie Dyson at Zenith Media a proposal for the company Stouffer's to be a title sponsor of the Improv-Ice Show (the "Stouffer's Proposal"). (Disson SOF ¶ 76.) The Stouffer's Proposal included Baiul's name and likeness. (Id. ¶ 77.) On August 2, 2011, Dyson emailed Disson that Stouffer's was not interested in becoming a title sponsor for the Improv-Ice Show. (Id. ¶ 78.)

On July 21, 2011, after Baiul had committed to the Improv-Ice Show but before Disson learned that she would not be participating, Disson emailed Tamara Rabi at Optimedia a proposal for the company Stride Rite to be a title sponsor of the Improv-Ice Show (the "Stride Rite Proposal"). (Id. ¶ 81.) The Stride Rite Proposal also included Baiul's name and likeness. (Id. ¶ 82.) On July 25, 2011, Rabi emailed Disson that Stride Rite was not interested in becoming a title sponsor for the Improv-Ice Show. (Id. ¶ 83.)

According to Baiul, the radio stations Magic 98.9 and ROCK101 used Baiul's name on their websites in order to promote the Improv-Ice Show. (Baiul-NBC SOF

¶¶ 9(3), (4); Markovich Decl. Exs. 9, 10.)  Baiul cites no evidence that either Disson

or the NBC Defendants had any involvement in the posting of Baiul's name on

these websites.  (NBC SOF ¶ 152; Disson SOF ¶ 57.)

G.    The February 2, 2012 Press Release

To inform other media outlets about the Disson broadcasts, the NBC Sports

communications department prepared an informational press release about each

program and posted it on NBCUniversal's Media Village a few days before each

broadcast.  (Id. ¶ 65.)[11]  Media Village is a website for editorial use by United

States-based media—it includes news releases about company-wide topics, such as

NBCUniversal's year-to-date performance, and information about upcoming

broadcasts.  (Id. ¶ 66.)  Other media outlets (such as local newspapers) rely on

Media Village to create and report on television listings.  (Id.)  Media Village is not

targeted to the television viewing audience or the general public; in fact, full access

to the site requires registration with United States media credentials.  (Id. ¶¶ 67,

69.)  Media Village does not contain episode guides, video clips, full schedule line-

ups, merchandise sales, or social media interaction.  (Id. ¶ 68.)

---

[11] Baiul argues that all statements of material fact (including this one) that are based on the
declarations of Justine DeMaio and Adam Freifeld, which were submitted by the NBC Defendants in
support of their motions for summary judgment, should be stricken and disregarded because these
individuals were not produced for depositions in response to a notice of deposition served on the NBC
Defendants on July 29, 2013.  (Baiul NBC SOF ¶ 2.)  This argument is rejected.  Baiul's July 29,
2013 deposition notice required the NBC Defendants to designate and produce an individual to
testify on behalf of the noticed entities, "NBCUniversal Media LLC" and "NBC Sports Network L.P.,"
pursuant to Federal Rule of Civil Procedure 30(b)(6) with respect to certain identified categories.
(See Markovich Decl. Ex. 1.)  The NBC Defendants did so by designating and producing Jonathan
Miller, President of NBC Sports Programming.  (See Talbert Supp. Decl. Exs. 1, 2.)  Baiul never
noticed declarations for Freifeld or DeMaio, although each was identified by the NBC Defendants in
their June 17, 2013 Rule 26 disclosures.  (See id. Ex. 3.)  These declarations are thus properly
considered by the Court on this motion.  See Fed. R. Civ. P. 56(c)(4); see also United Magazines Co. v.
Murdoch Magazines Distrib., Inc., 353 F. Supp. 2d 433, 442 n.8 (S.D.N.Y. 2004).

SPA-17

From October 2011 through February 2012, Justine DeMaio was an employee
with the NBC Sports communications department, whose responsibilities included
preparing informational press releases for Media Village.  (Id. ¶ 77.)  On October 21,
2011, Plage emailed DeMaio to request DeMaio's assistance in coordinating radio
interviews to promote upcoming broadcasts.  (Id. ¶ 78.)  Plage attached multi-page
fact sheets ("Fact Sheets") for the shows to her October 21 email, which listed: (a)
the name of the show; (b) a brief description of each show; (c) the location of the live
event; (d) a list of the participating figure skaters with brief biographical
information; (e) the identify and brief biography of the hosts; and (f) the musical
guest.  (Id. ¶¶ 79-80.)  Plage did not attach a fact sheet for one of the eight shows
and attached two different versions of a fact sheet for another.  (Id. ¶ 81.)  When
DeMaio followed up with Plage on the missing information, Plage sent
back a press release on the missing show but noted that one of the figure skaters
that was identified therein as performing (not Baiul) had not appeared in the show.
(Id. ¶ 82.)  Plage explicitly instructed DeMaio to "take her name out."  (Id. ¶ 83.)
According to DeMaio, it was her expectation that Plage would continue to notify her
of any other inaccuracies in the Fact Sheets.  (Id. ¶ 84.)

Plage's October 21, 2011 email attached a Fact Sheet for the season's final
show, the Moments of Love Show.  (Id. ¶ 85.)  The Fact Sheet's description of the
event stated: "**WHAT: Pandora® Unforgettable Moments of Love on Ice**
brings romance to the ice rink.  Olympic, World and National medalists, led by
**Ekaterina Gordeva and Oksana Baiul**, perform numbers to love-inspired music

17

**SPA-18**

performed live to entertain the audience." (Id. ¶ 86.)  The Fact Sheet also included

Baiul second among the list of ten participating figure skaters and identified her as

"1994 Olympic Champion" and "1993 World Champion." (Id. ¶ 87.)

On January 31, 2012, shortly before the February 4, 2012 scheduled

television broadcast of the Moments of Love Show, DeMaio and Plage exchanged

emails to arrange a radio interview for Sasha Cohen, who had been a featured

skater in the Show.  (Id. ¶¶ 88-89.)  Plage routinely enlisted DeMaio's assistance in

coordinating radio interviews for the season's broadcasts.  (Id. ¶ 90.)  DeMaio asked

Plage to send her Cohen's "bio and a fact sheet about the event." (Id. ¶ 91.)  Later

that day, Plage emailed DeMaio a biography of Cohen and a separate document

entitled "TUNE-IN ALERT" containing information about the Moments of Love

Show (the "Tune-In Alert").  (Id. ¶ 92.)  The Tune-In Alert was intended primarily

for use in conjunction with the radio interviews and provided the date and time of

the Show's broadcast.  (Id. ¶ 93.)  The Tune-In Alert was thus less detailed than the

Fact Sheets Plage sent DeMaio on October 21, 2011—it did not, for example, include

a description of the show or biographical information about the skaters or the hosts.

(Id. ¶¶ 94-95.)  The Tune-In Alert did not list Baiul as among the skaters.  (See

Talbert Decl. Ex. 16.)

Within the next few days, DeMaio drafted an informational press release

about the Moments of Love Show to post on Media Village (the "Press Release").

(NBC SOF ¶ 98.)  The Press Release, dated February 2, 2012, stated, in substance

that Sasha Cohen, Ekaterina Gordeeva, and Oksana Baiul "headline" and "will

18

SPA-19

perform" in the show. (See Talbert Decl. Ex. 17.) It states: "This love-inspired performance will be led by 2006 Olympic Silver Medalist and U.S. Champion Sasha Cohen, two-time Olympic Champion and four-time World Pairs Champion Ekaterina Gordeeva and 1994 Olympic Champion and 1993 World Champion Oksana Baiul." (Id.)

In drafting the Press Release, as was her practice, DeMaio relied on the Fact Sheet for the Moments of Love show for information about the show's contents. (NBC SOF ¶ 96.) According to DeMaio, she did not realize that Baiul, as well as Tanith Belbin and Ben Agosta, were not identified as skaters in the Tune-In Alert although they had been included in the Fact Sheet for the Moments of Love Show. (Id. ¶¶ 97, 108.) It was DeMaio's understanding that Baiul was in the Moments of Love Show when she drafted the Press Release for the Show and included Baiul in it. (Id. ¶ 103.) DeMaio never saw a broadcast of the Moments of Love Show. (Id. ¶ 104.) No one from NBC Sports or NBCUniversal told DeMaio to include Baiul in the Press Release. (Id. ¶ 105.) Neither Plage nor anyone else told DeMaio that Baiul was not in the Moments of Love Show. (Id. ¶ 106.) Plage never told DeMaio that the Fact Sheet for the Moments of Love Show was inaccurate or that it should not have included Baiul. (Id. ¶ 107.)

DeMaio personally posted the Press Release on Media Village on Thursday, February 2, 2012, two days before the broadcast of the Moment of Love Show on Saturday, February 4, 2012. (Id. ¶ 112.) DeMaio's supervisor reviewed the Press Release before it was posted solely for editorial purposes. (Id. ¶ 113.) No one in the

19

SPA-20

NBC Sports programming, production, or promotions departments reviewed the Press Release before it was posted on Media Village.  (Id. ¶¶ 114-16.)  DeMaio also never shared the Press Release with Plage or anyone affiliated with Disson.  (Id. ¶ 117.)  No Disson entity had any involvement in the issuance of the Press Release or knowledge of it prior to its posting.  (Disson SOF ¶¶ 61-62.)

NBC Sports did not create or publish any information besides the Press Release—on television, on the Internet, or via any other media—about Baiul's participation in the Moments of Love Show or any other show in Disson's 2011-2012 skating series.  (NBC SOF ¶¶ 118, 150-53, 155-61.)

H.   NBC Learns of the Error in the Press Release

In a letter to NBCUniversal dated May 15, 2012, Peter Skolnik, an attorney for Baiul, referenced the Press Release and stated that Baiul had not participated in the Moments of Love Show and had declined Disson's invitation to appear in the show.  (Id. ¶¶ 119-121.)  Skolnik asserted in his letter that the inclusion of Baiul's name in the Press Release was a violation of multiple statutes, and requested that NBCUniversal contact him "so that litigation may be avoided."  (Id. ¶¶ 122-23.)  Skolknik's May 15, 2012 letter was NBCUniversal's first notice of an error in the Press Release.  (Id. ¶ 125.)  NBC Sports immediately removed the Press Release from Media Village after receiving the letter.  (Id. ¶ 126.)

NBC Sports determined that no television advertisements or promotions for the Moments of Love Show broadcast included Baiul.  (Id. ¶ 128.)  NBC Sports was able to locate only one other media source, TheEntertainmentHotline.net, that

SPA-21

appeared to have reported on the Press Release. (Id. ¶ 129.) The Entertainment Hotline website is not a NBCUniversal or NBC Sports website. (Id. ¶ 134.) No Disson company had any involvement with this posting. (Disson SOF ¶ 73.)

In a letter to Skolnik dated May 25, 2012, NBCUniversal in-house counsel Gillian Lusins stated that its "internal investigation has determined that the inclusion of Ms. Baiul's name in the [Press] Release was an unfortunate error." (Talbert Decl. Ex. 21 at NBCU 00174.) Lusins stated that the error was caused by DeMaio's reliance on the outdated information—the Fact Sheet. (NBC SOF ¶ 131.) Lusins stated that no television advertisements or promotions for the Moments of Love Show had included Baiul. (Id. ¶ 132.) Finally, Lusins stated that it had been able to locate only one other source that had reported on the Press Release. (Id. ¶ 133.) According to Lusins, Disson was not involved in the drafting or sending of the May 25, 2012 letter. (Disson SOF ¶ 103.)

## I.    Defamation

Baiul's defamation claims against the Disson Defendants in the Libel Action[12] stem from alleged statements by Stephen Disson as attributed to him in articles published in the New York Daily News (the "Daily News") on February 4, 2013 and in the New York Post (the "Post") on February 5, 2013. (Id. ¶ 115.) Both articles were about the Lanham Act Action. (Id. ¶ 116.)

According to the Daily News, Disson stated that "his company never publicly disclosed his negotiations to have Baiul appear." (Markovich Decl. Ex. 50 at 2.) The Daily News quotes Disson as saying "[i]t's just weird" with respect to the suit.

_____

[12] Neither the NBC Defendants nor any NBC entities are defendants in the Libel Action.

21

**SPA-22**

(Id.)  The Daily News says that, with respect to their July 18, 2011 conversation, "Baiul then called [Disson] to say how much she appreciated the offer, given how poorly she'd performed on prior shows."  (Id.)  The Daily News quotes Disson as saying "Each time she had been a little flaky.  One time, she didn't show up.  She was out shopping.  Another time, she refused to do a retake after she had fallen. . . . She was grateful for a third chance.  We had a good talk.  I said I'd send a contract."  (Id. Ex. 50 at 3.)

Disson testified at his deposition that the basis for his statement concerning Baiul not showing up to a rehearsal because she was "out shopping" was a conversation he had with figure skater Brian Boitano.  (Disson SOF ¶ 141.)  Baiul admitted that her former agent heard the same facts as described by Disson.  (Id. ¶ 142.)  Baiul also admitted that, prior to 2011, it was gossip in the skating business that Baiul missed an event because she was out shopping.  (Id. ¶ 143.)  Baiul testified at her deposition that she cannot recall whether she ever missed a dress rehearsal.  (Id. ¶ 144.)

According to the Post, Disson stated that Baiul "approached him through an agent in mid-2011 and asked to be included in the shows, then backed out within weeks after he agreed—well before he started ads for them."  (Markovich Decl. Ex. 51.)  The Post quotes Disson as saying: "We never announced Oksana in either show or featured her in any of our advertising or promotion materials."  (Id.)

22

**SPA-23**

## III.   STANDARD OF REVIEW

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory

23

statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

IV.    THE LANHAM ACT ACTION

Baiul asserts four causes of action against the NBC Defendants and Disson— (A) violation of the Lanham Act, 15 U.S.C. § 1125(a); (B) violation of New York Civil Rights Law § 51; (C) common law fraud; and (D) negligent misrepresentation.[13] Even assuming Baiul has sued the correct Disson entity,[14] these claims are wholly without merit.

A.    Lanham Act

According to Baiul, the allegedly actionable unauthorized uses of her name by defendants are: (1) with respect to the Moments of Love Show, in the Press Release, on The Entertainment Hotline website, and in certain background information about the Moments of Love Show sent by Disson to Martin on July 12,

---

[13] Baiul has withdrawn her fifth cause of action for spoliation. (See Baiul-NBC Opp. at 25-26, ECF No. 52.)

[14] Disson argues that the alleged uses of Baiul's name and likeness were by non-party Disson PA, not defendant Disson Skating (which did not exist at the time of the relevant events). (See Disson Mem. of Law at 13, ECF No. 51.)

2011; and (2) with respect to the Improv-Ice Show, on the websites for the radio stations Magic 98.9 and Rock 101.[15]  (See Baiul-NBC SOF ¶ 9.)

Section 43(a) of the Lanham Act prohibits a person from "us[ing] in commerce any . . . false designation of origin . . . which (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (b) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . ."  15 U.S.C. § 1125(a)(1).  This statute "gives a statutory remedy to a party injured by another's 'false designation of origin' whether or not the party has secured a federal registered trademark for the item at issue."  L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc., 79 F.3d 258, 262 (2d Cir. 1996) (citing LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 75 (2d Cir. 1985).

    1.   Use in Commerce

As the language of the statute indicates, liability under Section 43(a) requires, at a minimum, that the plaintiff establish that the defendant used the false designation of origin in commerce.  See 15 U.S.C. § 1125(a)(1); 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, (2d Cir. 2005).  The Lanham Act defines

---

[15] The remaining "unauthorized uses" listed by Baiul are not asserted as a basis for the causes of action in the operative complaint in the Lanham Act Action.  In fact, the Court denied Baiul's motion to amend the complaint in the Lanham Act Action in order to add these additional alleged unauthorized uses.  (See 9/24/13 Order.)  In any event, even if the Court were to consider these unauthorized uses as properly plead (which they are not), they would also be dismissed on these motions for the reasons set forth herein.

SPA-26

"use in commerce," in relevant part, as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "For purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Id.; Kelly-Brown v. Winfrey, 717 F.3d 295, 306 (2d Cir. 2013) ("[I]n determining whether the plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction.").

Simply put, there are no genuine issues of material fact for trial as to the uses of Baiul's name and likeness alleged in the complaint under the Lanham Act. Many of the uses do not constitute uses by the NBC Defendants, the Disson Defendants, or any Disson entity at all, and those that do are plainly not uses in commerce.

With respect to the uses of Baiul's name on the websites for The Entertainment Hotline, Magic 98.9, and Rock 101, there is absolutely no evidence in the record connecting defendants to these uses—there is no evidence that defendants owned, operated, or were affiliated with these websites, that they sent or provided these websites with any information about the Disson Shows referencing Baiul, or that they had any involvement at all with the posting of Baiul's name on these websites. In fact, the undisputed evidence in the record is that the venues hired by Disson handled all advertisements associated with the Disson Shows, Disson reviewed and approved each of these advertisements, and

26

**SPA-27**

none of them included Baiul's name. Though Disson sent the venue for the Improv-
Ice Show, a background information packet that listed Baiul as a "Suggested
Skater" on July 14, 2011 (at a time when Disson was negotiating this possibility
with both Martin and Baiul), there is no evidence in the record that the venue sent
this packet to anyone else or that Disson or any Disson entity instructed it to do so.

With respect to the background information concerning the Moments of Love
Show sent by Disson to Martin (Baiul's agent or, at the very least, potential agent[16])
on July 12, 2011, there is no evidence in the record that this email or its
attachments were ever displayed to consumers or sent to anyone else besides
Martin. To the contrary, the record evidence concerning this email is that (1)
Martin does not ever recall opening the attachments (which reference Baiul); and
(2) Baiul admitted during her deposition that she has no evidence that this email or
its attachments were ever sent to anyone else besides her and Martin (see DeOreo
Decl. Ex. G at 141, 143).

Finally, with respect to the Press Release, Baiul also fails to create a genuine
issue of material fact for trial as to liability under the Lanham Act because the NBC
Defendants did not use the Press Release in commerce. The record evidence
establishes that the Press Release was issued on February 2, 2012 and posted on
Media Village, a website used to provide United States-based media with
information about upcoming NBC broadcasts. Media Village is not targeted to the
television viewing audience, advertisers or the general public; full access to the site

---

[16] The Court need not resolve the issue of whether Baiul actually hired Martin to represent her as
either a legal or factual matter for purposes of these motions.

27

SPA-28

requires registration with United States media credentials. The NBC Defendants played no role in selling advertisements against the Moments of Love Show broadcast and, because the Press Release was published approximately 48 hours before the broadcast, could have had no effect on Disson's advertising sales (which were required to be submitted to NBC for standards review at least 72 hours prior to broadcast). Baiul's primary argument that the Press Release was used in commerce by the NBC Defendants appears to be the fact that NBC used some commercial time (a few minutes during a two-hour show) to promote upcoming programs on NBC, and that these commercials thus resulted in higher ratings and advertising revenue for NBC. (See Baiul-NBC Opp. at 24, ECF No. 52.) Baiul, however, does not provide any facts in support of this theory (or any citations to the record in this portion of her brief), and, as such, provides no facts that tie this theory—that NBC made more than the flat $400,00 per-broadcast fee from Disson for the Disson Shows—to the issuance of the Press Release.

2.   <u>Damages</u>

Baiul's Lanham Act claims also fail because she has failed to show that she is or is likely to be damaged by defendants' allegedly false designations of origin concerning the Disson Shows.[17] See 15 U.S.C. § 1125(a). Section 35(a) of the Lanham Act provides that plaintiff who is successful under Section 43(a) may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).

---

[17] As discussed <u>infra</u>, Baiul's other claims—in both the Lanham Act Action and the Libel Action—also fail because of the speculative (at best) nature of the evidence offered by Baiul as to damages.

Case 14-3339, Document 39, 11/24/2014, 1377927, Page 98 of 119

To call Baiul's arguments as to damages speculative is indeed charitable—she offers no credible evidence whatsoever that she has suffered or will suffer any compensable damages as result of defendants' alleged conduct.

Baiul seeks at least $1,006,487 in compensatory damages for each of her four causes of action in the Lanham Act Action, as well as $500,000 in punitive damages. (See Markovich Decl. Ex. 56.) Baiul contends that the damage to her reputation caused by defendants' actions will result in fans not purchasing tickets to her shows, potential advertisers and show promoters becoming leery of working with her, and a decrease in the syndication of two 1994 movies she was involved with, Nutcracker on Ice and Broken Promises: The Oksana Baiul Story (the "Baiul Movies"). (NBC SOF ¶ 140; Baiul-NBC SOF ¶¶ 107-108.) Baiul expects this damage to last for at least ten years. (NBC SOF ¶ 141.)

In calculating her past earnings, Baiul estimates that: she should have earned $40-80 million in royalty income since 1994 from syndication of the Baiul Movies; she would have earned this amount had it not been stolen and concealed from her by a 20-year conspiracy involving dozens of non-parties to this action, including agents, managers, producers, coaches, accountants, and networks; and the reputational damage caused by defendants' alleged conduct will cause her to suffer a hit to this future income for at least the next decade. (NBC SOF ¶ 143; Disson ¶¶ 177-78.) The source for these far-fetched allegations is not factual, but rather allegations in another lawsuit filed by Baiul and Baiul's counsel—Baiul v.

William Morris Agency, LLC et al., 13 Civ. 8683—that is also before this Court. (See Markovich Decl. Ex. 55.)

Baiul declined to answer questions about her finances and her alleged financial damages during her deposition; she authorized Carlo J. Farina, her business manager, to testify on her behalf as to these issues. (NBC SOF ¶ 154.) Farina testified, inter alia, that Baiul cried a lot and had many sleepless nights from April to May 2012, and beginning again in February 2013 (when she filed the instant actions). (Id. ¶¶ 146-47; Baiul-NBC SOF ¶¶ 106-107, 114.) It is undisputed, however, that Baiul has never sought medical attention for this alleged emotional harm. (NBC SOF ¶ 148.)

Though Baiul has submitted copies of her Rule 26(a) disclosure from July 2013 and a table that purports to set forth these earnings estimates (see id. Exs. 56, 58), Baiul has not submitted any documents to support these calculations. (See NBC SOF ¶ 145; Disson SOF ¶¶ 179-83.) Even a quick look at these estimates shows why. The average earnings per year used as an assumption in these calculations—$1,539,428—is directly contradicted by the tax returns for Oksana Ltd. (the legal entity used to conduct Baiul's business ventures) from 2007 through 2011, which do not reflect a gross income above $109,000 for any year and only $3,131 in 2011. (Disson SOF ¶¶ 184-86.) The $115,000 in yearly compensatory damages that Baiul seeks is more than Oksana Ltd. earned in total gross income for the years 2008 through 2011 combined, and more than Oksana Ltd. made in its best year of 2007. (Id. ¶¶ 187-88.) Farina testified at his deposition that he arrived at

$115,000 by multiplying the average yearly earnings of $1,539,428 by 7.47%, which he admitted was a "random" number. (Id. ¶¶ 189-91.)

Both Baiul and Farina testified that, since the alleged conduct by defendants in these actions, Baiul has not received the kinds of offers for skating performances that she had previously received. (Id. ¶ 167.) Between 2007 and August 2010, however, Baiul had only received one offer for a paid skating show. (Id. ¶ 168.) According to Baiul, she only performed in "a couple" of paid skating shows between 2006 and 2011, and none in 2011. (Id. ¶¶ 170-71.) Though Stephen Disson testified that he would not hire someone with the reputation of a no-show, Baiul is personally unaware of anyone who has actually called her a no-show. (Baiul-NBC SOF ¶ 108; NBC SOF ¶ 149.) Finally, Baiul's assertions concerning her future earnings in the skating industry are belied by her August 12, 2011 email to Disson; in response to Disson's questions about why she was no longer interesting in participating in the Disson Shows, Baiul stated that she did not want to skate anymore. (See DeOreo Decl. Ex. T at 1.)

Baiul has not identified a single fan that purchased a ticket for the Moments of Love Show with the expectation that she would be in the Show; in fact, the Press Release was published after the live show, and thus could not have had any impact on these ticket sales. (NBC SOF ¶¶ 162-63.) Baiul cannot identify a single fan or potential show producer who concluded she was a no-show because of the Press Release. (Id. ¶ 164.) Aside from The Entertainment Hotline (which NBCUniversal informed Baiul about directly), Baiul could not identify any source that picked up

SPA-32

the Press Release.  (Id. ¶ 165.)  Baiul has also presented no evidence as to how many people saw the Press Release, which was not available or targeted to consumers or the general public.  (Id. ¶ 166.)  As is discussed supra, the Press Release was published too late to have an impact on any advertising sold by Disson or the venues for the Disson Shows.  Additionally, at the time all of the sponsors for the Disson Shows agreed to be sponsors, they had all been informed of the current skating cast lists, which did not include Baiul.  (Id. ¶ 106.)

In sum, Baiul's alleged damages in the Lanham Act Action are simply wild conjecture and wild speculation; the assumptions she, her business manager, and her attorney used to arrive at the proffered damages calculations are both incredible on their face and directly contradicted by the record evidence offered in support of these motions.

### B.    New York Civil Rights Law § 51

Section 51 of the New York Civil Rights Law ("Section 51") provides "a limited statutory right of privacy."  Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g, 727 N.E.2d 549, 551 (N.Y. 2000).  Section 51 states, in relevant part: "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purpose of trade without consent first obtained . . . may maintain an equitable action . . . against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use . . . ."  N.Y. Civil Rights Law § 51.

32

New York courts hold that Section 51 "is to be narrowly construed and strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person." Messenger, 727 N.E.2d at 552 (internal quotation marks and citations omitted). Section 51 does not apply to "to reports of newsworthy events or matters of public interest" in light of the "constitutional values in the area of free speech." Id. (internal quotation marks and citations omitted). "Newsworthiness is to be broadly construed . . . [it] includes not only descriptions of actual events but also articles concerning political happenings, social trends or any subject of public interest." Id. (internal quotation marks and citations omitted).

For the reasons set forth in Section IV.A.1 supra, none of the alleged unauthorized uses in the complaint were used by defendants for trade or advertising purposes. For the reasons set forth in Section IV.A.2 supra, Baiul fails to proffer any evidence beyond mere conclusory allegations that she has suffered damages as a result of defendants' alleged conduct. Accordingly, Baiul's Section 51 claim fails, and the Court need not reach the other arguments offered by the NBC Defendants in support of dismissing this claim.

C.    Fraud and Negligent Misrepresentation

Common law fraud under New York law requires that a plaintiff establish (1) a material misrepresentation of fact or omission; (2) made with knowledge of its falsity and the intent to deceive; (3) justifiable reliance; and (4) damages. Lanzi v. Brooks, 373 N.E.2d 278, 279 (N.Y. 1977). A claim for common law negligent misrepresentation under New York law "requires the plaintiff to demonstrate (1)

33

**SPA-34**

the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." <u>Mandarin Trading Ltd. v. Wildenstein</u>, 944 N.E.2d 1104, 1109 (N.Y. 2011).

Baiul bases both of these claims on the May 25, 2012 letter from NBC's in-house counsel to Baiul's prior counsel.[18] Baiul argues, in substance, that this letter failed to tell Baiul's prior counsel about all of the alleged unauthorized uses of Baiul's name and likeness in connection with the Disson Shows, and that by failing to do so the NBC Defendants committed common law torts. (<u>See</u> Baiul-NBC Opp. at 25; Talbert Decl. Ex. 21.)

These claims fail. In addition to failing to put forth any non-speculative evidence of damages, <u>see</u> <u>supra</u> Section IV.A.2, there is no evidence of contemporaneous falsity or intent to deceive regarding the May 25, 2012 letter. The letter states that the inclusion of Baiul's name in the Press Release was an error, it explains how the error occurred, it states that no television advertisements or promotions for the Moments of Love Show included Baiul, and it states that NBC had only been able to locate one other source that had reported on the Press Release. (<u>See</u> Talbert Decl. Ex. 21.) There is no evidence that any of these statements were false, or that the drafter of the May 25, 2012 letter knew them to be false at the time.

---

[18] Baiul concedes that "Defendant NBC could have said nothing and Plaintiff likely would not have a claim but Defendant NBC chose to tell Plaintiff something other than the truth and Plaintiff has been damaged." (Baiul-NBC Opp. at 25.)

SPA-35

V.    THE LIBEL ACTION

In the Libel Action, against the Disson Defendants only, Baiul asserts sixteen causes of action for libel as a result of quotes or statements attributed to Stephen Disson in articles published in the Daily News on February 4, 2013 and the Post on February 5, 2013.  Both articles were about Baiul's filing of the Lanham Act Action.

In New York,[19] "a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)."  Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (summarizing New York law).

"Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation."  Id. at 179 (internal quotation marks and citations omitted).  "[A] writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages."  Id. (internal quotation marks and citations omitted).

---

[19] Baiul's argument that Pennsylvania law applies to her claims in the Libel Action is without merit. Though Baiul notes that Pennsylvania and New York defamation law are not the same, Baiul does not provide any basis to apply Pennsylvania law. (See Baiul-Disson Opp. at 6-7, 13 Civ. 2208, ECF No. 42.)  Under New York choice of law rules, the situs of the tort of defamation should control.  See Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999) (applying New York choice of law rules). Here, because the allegedly defamatory statements were reported in New York papers describing pending litigation in New York, this Court applies New York law.  See PowerDsine, Inc. v. AMI Semiconductor, Inc., 591 F. Supp. 2d 673, 680 (S.D.N.Y. 2008); Test Masters Educational Servs., Inc. v. NYP Holdings, Inc., No. 06 CV 11407 (BSJ), 2007 WL 4820968, at *5 (S.D.N.Y. Sept. 18, 2007); Keogh v. Texaco Inc., No. 97 Civ. 5981 (LMM), 1999 WL 61836, at *5 (S.D.N.Y. Feb. 10, 1999).

**SPA-36**

Baiul's libel claims arising out of the Daily News and the Post articles fail for a number of reasons. First, Baiul has failed to put forth facts sufficient to create a genuine issue of fact for trial as to the falsity of <u>any</u> of the allegedly libelous statements, let alone that the statements were made with actual malice— knowledge that the statements were false or recklessly disregarding whether they were false or not. <u>See</u> <u>Liberman v. Gelstein</u>, 605 N.E.2d 344, 348 (N.Y. 1992).[20]  In fact, with respect to Disson's statement in the Daily News that Baiul had previously missed a dress rehearsal because she was out shopping, Disson explained at his deposition that he heard this information from another well-known figure skater, Baiul admitted during her deposition that her former agent heard the same story, that prior to 2011 it had been gossip in the skating industry that Baiul missed an event because she was out shopping, and that she could not recall whether she ever missed a dress rehearsal. Similarly, with respect to the other statements attributed to Disson concerning his conversations with Baiul, the lack of "public" disclosure of his negotiations with Baiul, and the fact that Disson did not use Baiul in any promotional or marketing materials, there are no facts in the record that suggest that such statements were false. In fact, as is discussed in Section IV.A.1 <u>supra</u>, the record evidence indicates that these statements were true.

---

[20] Baiul is a world famous figure skater who won the 1993 World Championship, Ladies Figure Skating and became the 1994 Olympic Gold Medalist in Ladies Figure Skating. (Disson SOF ¶ 1.) In Baiul's own words, she is "the highest figure skater who's been on TV and my Olympics were the highest rated Olympics," she has "a title given to me by the media queen of the ice," and she considers herself a "superstar" and a "global entertainer." (DeOreo Decl. Ex. G at 382, 424.) It cannot be disputed that Baiul is a public figure for purposes of New York defamation law. <u>Cf.</u> <u>Celle</u>, 209 F.3d at 177 ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community, the district court correctly held that he is a public figure.").

36

Second, many of Baiul's libel claims are barred by the absolute litigation privilege under New York law. "Under New York law, in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation." O'Brien v. Alexander, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (internal quotation marks and citations omitted) (summarizing New York law). "The absolute privilege embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." Grasso v. Mathew, 564 N.Y.S.2d 576, 578 (N.Y. App. Div. 1991). Courts have applied this privilege well beyond statements in pleadings and in court to, inter alia, statements "by an attorney in a magazine article quoting from and restating the allegations of the complaint." O'Brien, 898 F. Supp. at 171. As a result, Disson's statements concerning the Lanham Act Action, including his description of the suit as "just weird," clearly fall within this privilege and may not serve as a basis for a libel action.

Third, Baiul fails to proffer any non-speculative evidence as to the damages she has suffered as a result of Disson's allegedly defamatory statements. In the Libel Action, Baiul seeks more than $40,000,000 in combined damages for the sixteen libel causes of action she asserts, as a result of variations on the same lost earnings calculations (with their specious assumptions) used in the Lanham Act Action. (See Markovich Decl. Exs. 57, 58.) As previously discussed, see supra

Section IV.A.2, these damages assumptions and calculations are wholly without a basis in fact and are rejected.[21]

## VI.  CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment in both the Lanham Act Action and the Libel Action are GRANTED and these actions are DISMISSED.

The Clerk of Court is directed to close the motions at ECF Nos. 31 and 47 in 13 Civ. 2205, and at ECF No. 35 in 13 Civ. 2208.  The Clerk of Court is also directed to close both actions.

SO ORDERED.

Dated:      New York, New York
            April **24**, 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge

---

[21] To the extent Disson's statement concerning Baiul's failure to show up for a dress rehearsal on one prior occasion references Baiul's business, profession, or trade, it remains non-actionable because of the single instance rule.  This rule "applies where a publication charges a professional person with a single error in judgment, which the law presumes not to injure reputation."  Celle, 209 F.3d at 180 (quoting Armstrong v. Simon & Schuster, Inc., 649 N.E.2d 825, 828 n.5 (N.Y. 1995)).

SPA-39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OKSANA S. BAIUL

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

- against -

NBCUNIVERSAL MEDIA, LLC.

NBC SPORTS NETWORK, LP. and

DISSON SKATING, LLC

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

1:13  Civ. 02205  (KBF) (___)

**NOTICE OF APPEAL
IN A CIVIL CASE**

Notice is hereby given that _____ OKSANA S. BAIUL _____
                                                    *(party)*

hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment

granting Defendant  NBCUNIVERSAL MEDIA, LLC's motion for summary judgment and

*(describe the judgment)*

the dismissal of the action against defendant NBCUNIVERSAL MEDIA, LLC.

_____

entered in this action on the ___24th___ day of ___April___, 20 14 .
                                         *(date)*                  *(month)*      *(year)*

Signature  Raymond J. Martovich , Esq (RM0919)

351 Westbourne Drive
*Address*

West Hollywood, CA 90048
*City, State & Zip Code*

DATED: ___May___  _22_ , 20 14         ( 323 ) 401 - 8032
                                                             *Telephone Number*

NOTE: To take an appeal this form must be received by the *Pro Se* Office of the Southern District of New York within thirty (30) days of the date on which the judgment was entered, or sixty (60) days if the United States or an officer or agency of the United States is a party

Rev 05/2007

SPA-40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 22, 2014
```

-------------------------------------------------------X
                                                       :
OKSANA S. BAIUL,                                       :
                                                       :
                              Plaintiff,               :                    13-cv-2205 (KBF)
                                                       :
              -v-                                      :                   MEMORANDUM
                                                       :                 DECISION & ORDER
NBCUNIVERSAL MEDIA, LLC, et al.,                       :
                                                       :
                              Defendants.              :
                                                       :
-------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On April 24, 2014, this Court granted defendants' motions for summary

judgment and dismissed this action, which was brought by plaintiff Oksana Baiul

for violations of the Lanham Act, 15 U.S.C. § 1125(a), and New York Civil Rights

Law § 51, as well as for common law fraud and negligent misrepresentation.  (ECF

No. 87.)  The Court found that plaintiff's claims were wholly without merit.  (Id. at

2.)

On May 21, 2014, defendants NBC Universal Media, LLC and NBC Sports

Network, LP (the "NBC Defendants") moved to recover attorney's fees pursuant to

15 U.S.C. § 1117(a) for the expenses they incurred in defending against this action.

(ECF Nos. 91-93.)  Baiul opposed the motion on June 6, 2014, and the NBC

Defendants filed their reply in further support of the motion on June 11, 2014.

(ECF Nos. 97, 99-101.)  On July 14, 2014, this Court granted the motion and

directed the parties to make additional submissions concerning the precise amount

SPA-41

of fees to be awarded.  (ECF No. 102.)  The NBC Defendants filed a submission concerning the precise amount of their attorney's fees on August 5, 2014 (ECF Nos. 118-19), and Baiul filed a submission opposing the NBC Defendants' fee request as unreasonable on August 8, 2014 (ECF Nos. 123-25).[1]

For the reasons stated below, the Court grants the NBC Defendants attorney's fees in the amount of $98,540.08.

## I.   LEGAL STANDARD

A district court has "considerable discretion" in determining what constitutes a reasonable fee award.  <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany</u>, 522 F.3d 182, 190 (2d Cir. 2008).  A reasonable fee award should be based on a "reasonable hourly rate," which is "the rate a paying client would be willing to pay," as determined based on a holistic assessment of all of the circumstances at issue in the case.  <u>Id.</u> at 190.  The "presumptively reasonable fee" is the "product of a reasonable hourly rate and the reasonable number of hours required by the case," and is known as the "lodestar."  <u>Millea v. Metro-N. R.R. Co.</u>, 658 F.3d 154, 166 (2d Cir. 2011).  The court may adjust the lodestar upward or downward based on its assessment of the specific circumstances at issue in the case. <u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 764 (2d Cir. 1998).  The use of the lodestar method for calculating an award of attorney's fees is appropriate for assessing the reasonableness of fees for in-house counsel.  <u>See</u> <u>Zacharias v. Shell Oil Co.</u>, 627 F. Supp. 31, 34 (E.D.N.Y. 1984); <u>Video-Cinema Films, Inc. v. Cable News</u>

---

[1] On July 31, 2014, Baiul moved to disqualify Judge Forrest.  (ECF No. 109.)  The Court denied this motion as frivolous on August 5, 2014.  (ECF No. 120.)

SPA-42

Network, Inc., Nos. 98 Civ. 7128 BSJ, 98 Civ. 7129 BSJ, 98 Civ. 7130 BSJ, 2004 WL 213032, at *6 (S.D.N.Y. Feb. 3, 2004).

A reasonable hourly rate is one in line with rates "prevailing . . . in the community for similar services by lawyers of reasonably comparable skill expertise and reputation." McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006) (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)). The relevant community is "the district in which the reviewing court sits." In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir. 1987). In determining the reasonable hourly rate, the court may rely on its knowledge of hourly rates at private firms. See Miele v. N.Y. State Teamster Conf. Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987). Where in-house counsel performs work that would typically be performed by a partner and an associate working together at a law firm, a district court may use a "blended" partner and associate rate. See Video-Cinema Films, 2004 WL 213032 at *6.

In recent years, New York district courts have approved rates for experienced law firm partners in the range of $500 to $800 per hour. E.g., Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 360 (S.D.N.Y. 2009) ($540 for partner with 24 years of experience); Union of Orthodox Jewish Congregations of Am. v. Royal Food Distribs. Ltd. Liab. Co., 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) ($735 for partner); Sub–Zero, Inc. v. Sub Zero N.Y. Refrigeration & Appliances Servs ., Inc., No. 13-CV-2548, 2014 WL 1303434, at *8-9 (S.D.N.Y. Apr. 1, 2014) ($485 for partner with 16 years of experience). New York district courts have also recently approved

3

SPA-43

rates for law firm associates in the range of $200 to $450 per hour.  Malletier, 687

F. Supp. 2d at 361-62 (noting that associate rates of $390 to $470 "fall at the very

top of the spectrum of reasonable hourly rates for associates," and approving

associate rates ranging from $200 to $390.10 as reasonable).

   An applicant for an award of attorney's fees generally must submit

"contemporaneous time records" that "specify, for each attorney, the date, the hours

expended, and the nature of the work done." N.Y. State Ass'n for Retarded

Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).  District courts have

"some limited discretion to make exceptions to the hard-and-fast rule." Scott v. City

of New York, 626 F.3d 130, 133 (2d Cir. 2010).  In certain cases, it may be unfair to

deny attorney's fees on the basis of an attorney's failure to maintain

contemporaneous records throughout the litigation.[2] Carey, 711 F.2d at 1147.

When a court makes such an exception, "it should not award the full amount

requested." F. H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265

(2d Cir. 1987).  Instead, it should reduce the award of fees by a set percentage,

typically 20% to 25%.  See Carey, 711 F.2d at 1147 (district court adequately

responded to shortcomings in fee application "with its percentage cuts from

requested hours); Johnson v. Kay, 742 F. Supp. 822, 836-37 (S.D.N.Y. 1990) (20%

reduction); Video–Cinema, 2004 WL 213032 at *7 (25% reduction).  An award of

---

[2] The Second Circuit has stated that examples of such "rare circumstances" include "where the records were consumed by fire or rendered irretrievable by a computer malfunction before counsel had an opportunity to prepare his application." Scott, 626 F.3d at 134.  However, the Second Circuit has never stated that such circumstances are the only ones in which a district court, in the exercise of its considerable discretion, may award attorney's fees in the absence of contemporaneous time records.

SPA-44

attorney's fees for preparing and litigating the fee application itself is inappropriate if the applicant spends an "inordinate amount of time" preparing the fee application due to "their failure to keep better records." <u>Carey</u>, 711 F.2d at 1148.

## II.    DISCUSSION

### A.    <u>Billing Rate</u>

The NBC Defendants were primarily represented in this matter by Chelley E. Talbert, an in-house attorney.  (Declaration of Chelley E. Talbert, ECF No. 199 ¶¶ 1, 3 ("Talbert Decl.").)  Ms. Talbert graduated from New York University School of Law in 2001, and she has 13 years of litigation experience, including eight years as an associate at large New York law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, two years as in-house counsel for a multinational corporation, and three years as in-house counsel at NBCUniversal.  (<u>Id.</u> ¶¶ 4-7.)  When Ms. Talbert was last employed by a law firm, her billing rate was over $500 per hour.  (Talbert Decl. ¶ 10.)  Ms. Talbert also represents that had she needed to rely on outside counsel for this matter, she "would have sought out counsel at a mid-size, New York law firm with expertise in trademark and privacy law and general commercial litigation," and that she "would have approved staffing this litigation with one partner, one associate, and one paralegal."  (<u>Id.</u> ¶ 9.)

The NBC Defendants argue that fees should be awarded at an hourly rate of $508.78.  (ECF No. 118 at 6 ("Def.'s Br.").)  This rate is calculated by blending the average 2012 New York partner rate and the average 2013 New York associate rate, under the assumption that work by partners would account for one third of the total

5

SPA-45

hours billed, and work by associates the remainder, and then applying a 15% discount. (Id.)

In light of Ms. Talbert's credentials and representations, the NBC Defendants' proposed hourly rate is eminently reasonable. Indeed, this rate is lower than Ms. Talbert's billing rate when she was last a law firm associate in New York and considerably less experienced than she is now. It is also in line with current market rates for attorneys with similar credentials at New York law firms (see Talbert Decl. exs. A, B), rates that the NBC Defendants pay to New York law firms for work on matters similar to this action (id. ¶ 10), and rates that have been approved by courts in this district, as outlined above. The Court finds that the NBC Defendants' proposed rate of $508.78 per hour is reasonable—indeed, it is good value. As the NBC Defendants argue it would be appropriate to apply a 10% discount based on "reported market practices" (Def.'s Br. At 9), this Court accordingly awards attorney's fees at the rate of $457.90 per hour.

B. Hours

The NBC Defendants request that this Court award fees for 215.2 hours of time spent by their in-house attorney Chelley E. Talbert. Talbert litigated this case from beginning to end—and performed or oversaw the bulk of the necessary legal work. In this regard, she performed legal research, drafted court filings and other documents, prepared for and took and defended depositions, and dealt with opposing counsel as well as other defense counsel. (Def.'s Br. At 8; Talbert Decl. ¶ 14.)

6

SPA-46

This was not all of the work the NBC Defendants did to defend themselves here.  However, the NBC Defendants have <u>sua sponte</u> suggested a significant discount by not seeking fees or costs relating to extensive work performed by two other attorneys and a paralegal.  In addition, they are not seeking reimbursement for time required for court appearances, travel, correspondence and teleconferences with opposing counsel, Rule 26.1 disclosures, and internal meetings and teleconferences.  (Talbert Decl. ¶¶ 21-22.)

The NBC Defendants have presented three ways in which they have documented the 215.2 hours for which they do seek reimbursement.  First, Talbert has submitted contemporaneous time records and a deposition log, which account for 121.3 hours.  (Talbert Decl. exs. C, D.)  Of these 121.3 hours, 19.7 hours were spent preparing the submissions detailing the precise amount of fees to which the NBC Defendants believe they are entitled.[3]  (<u>Id.</u> ex. C.)  This amount—which is less than three full days' work—is quite reasonable and appropriate.

Second, 37.4 hours are documented through the use of Westlaw search histories.  These search histories provide detail on time spent by Talbert on legal research.  From these records, Talbert was able to calculate the time spent researching and drafting defendant's motion for summary judgment and opposition to plaintiff's motion to amend.  (<u>Id.</u> ¶ 19.d.)

Talbert acknowledges that these search histories are not "traditional documentation," but represents that it is her "custom and practice to perform

---

[3] The law allows for recovery of fees for a reasonable amount of time spent preparing the fee application.  <u>See</u> <u>Carey</u>, 711 F.2d at 1148.

7

SPA-47

research and drafting of motions simultaneously, to have Westlaw accessible and open on [her] computer while [she is] drafting, and to refrain from doing other tasks while preparing motions whenever possible," and that the total of 37.4 hours was calculated by cross-reference to her emails, calendar, and significant time gaps to exclude time in which she was likely attentive to other tasks. (Id.) Using the Westlaw time records is, in fact, quite a reasonable way to proceed. It establishes the time, date, and duration of work performed.

Third, Talbert also estimates that she spent 56.5 hours working on the following tasks, for which she did not contemporaneously document her time: (1) preparation for the two-day depositions of plaintiff Baiul, Carlo Farina, and co-defendant Stephen Disson; (2) documents relating to defendant's motion for summary judgment; (3) defendant's motion in opposition to plaintiff's motion to amend; and (4) preparing defendant's answer to the complaint. Talbert has submitted a sworn declaration attesting to the time spent on these tasks. (Id. ¶ 20.)

Having carefully reviewed the NBC Defendants' submission with regard to hours, the Court concludes that their request is very reasonable. Ms. Talbert likely spent significantly more than 215.2 hours litigating this matter, and the Court notes that the NBC Defendants do not request compensation for the time worked by the two other attorneys and paralegal assigned to this matter. With regard to specificity, the contemporaneous records detail precisely which motion and which deposition to which they pertain; the relevance of the Westlaw research records is

8

SPA-48

clear based on the dates the research was conducted; and the estimates of the remaining time spent litigating this action are detailed and well-reasoned.

Further, while the NBC Defendants' documentation is not as complete as one would expect from outside counsel who typically bill by the hour, the NBC Defendants' legal department is organized differently.  Indeed, a major difference between outside and inside counsel is "the billable hour."  Nevertheless, both outside and inside counsel will necessarily expend similar amounts of resources on a given type of case.  It would therefore be unfair and unreasonable for the Court not to award reasonable recoupment for efforts as to which billable hourly records were not maintained so long as the work is fully supported.  It is here.

As part of its consideration of the reasonableness of the requested fees, the Court also notes the professionalism and high quality of the work performed.  The Court believes that to have had an outside law firm perform the same work would have resulted in at least double the number of hours and more than double the cost. Of course, had the NBC Defendants chosen to use an outside firm which had carefully tallied its billable hours in contemporaneous time records, the Court would review such an application for its own reasonableness.  It is highly likely that in terms of market rates and typical outside counsel practices, such a review would result in an award of an amount much higher than that requested here.  In short, the NBC Defendants should not be penalized for choosing to litigate a matter in-house.  Based on the Court's consideration of all the necessary factors and careful

SPA-49

review of all records submitted, the Court finds that the work for which NBC has requested reimbursement was appropriate, efficient, and reasonable.

Baiul argues that it is unreasonable for this Court to conclude that 30% of the NBC Defendants' hours spent litigating this action were spent litigating the issue of attorney's fees and costs.  (ECF No. 123 at 5 ("Pl.'s Br.").)  In fact, litigating the issue of costs in this matter has itself required extensive contested briefing.  The time attributable to those efforts is a conservative amount in the Court's view.

Moreover, the Court finds that—as represented—the NBC Defendants have made a quite conservative estimate of the time spent litigating the merits.  As a result, in measuring a "percentage" of the total hours for which the NBC Defendants have requested reimbursement against such a conservative denominator acts to overstate the relative work on different issues.

Baiul also argues that "many" of the hours for which the NBC Defendants seek compensation pertain only to the Disson action (no. 13-cv-2208) or Baiul's state court action against NBCUniversal, and therefore fees relating to these matters should be disallowed.  (Id. at 5, 9.)  But Baiul only specifically objects to a single record pertaining to the deposition of Barbara Ross, a reporter at the New York Daily News whose deposition related only to the Disson action; otherwise, this argument is completely unsubstantiated.  Baiul's arguments are without merit.

As Baiul is no doubt aware, her actions were similar and required similar work.  They were brought by the same plaintiff and, as to the NBC Defendants, against related defendants.  In this particular situation, work performed to monitor

10

SPA-50

a separate case was appropriate.  The Court is impressed that more time was not spent in this regard.

Accordingly, the Court awards the NBC Defendants fees for 215.2 hours for the reasonable value of attorney labor expended on this matter.

III.   CONCLUSION

The Court awards the NBC Defendants $98,540.08 in attorney's fees, which is calculated by multiplying the reasonable rate of $457.90 per hour by the reasonable amount of 215.2 hours.

SO ORDERED.

Dated:        New York, New York
              August 22, 2014

_____
KATHERINE B. FORREST
United States District Judge

11